John E. Tiedt (SBN 134667)
Marc S. Hurd (SBN 130667)
**TIEDT & HURD**
1250 Corona Pointe Court, Suite 402
Corona, CA 92879
T: 951-549-9400
E: jtiedt@tiedtlaw.com

Robert J. Lynch (SBN 192287)
**MCMAHON LYNCH LAW FIRM, INC.**
1250 Corona Pointe Court, Suite 407
Corona, CA 92879
T:  951-371-6868
E: rlynch@mcm-law.net

Attorneys for Plaintiff,
SDI LABS, INC., a California corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SDI LABS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMEDAY TECHNOLOGIES, INC., a Delaware Corporation dba SAME DAY HEALTH; PRAESIDIUM DIAGNOSTICS LLC, dba SAME DAY HEALTH AND SAME DAY TESTING; FUNDAMENTUM HEALTH, INC., a Delaware Corporation, QUICKMED DIAGNOSTICS, INC., a California Corporation dba QUICK MEDDX; FELIX HUETTENBACH, an individual; and DOES 1 through 50,<br><br>Defendants. | CASE NO. **2:23-CV-05619-MMFMRWx**<br><br>**FIRST AMENDED COMPLAINT** |

Comes now, Plaintiff, SDI LABS, INC., a California Corporation, which complains and alleges the following:

## **GENERAL ALLEGATIONS- PARTIES**

1.     At all times herein mentioned SAMEDAY TECHNOLOGIES, INC., is and was a Delaware Corporation dba SAME DAY HEALTH, ("Same Day") conducting business in Los Angeles County, with a principal place of business in Venice, California.   Same Day owns and operates various websites, such as www.Same Day testing.com. At all relevant times, Same Day has transacted business in California, including Los Angeles City and County.   Same Day is a subsidiary and/or successor corporation to Praesidium Diagnostics LLC.   Felix Huettenbach is the CEO of Same Day.

2.     At all times mentioned herein QUICKMED DIAGNOSTICS, INC., is and was a California Corporation dba QUICK MEDDX ("QuickMed"), operates with multiple locations and clinics nationwide (California, Maryland, Massachusetts, Indiana, New Jersey, Florida, Connecticut, Virginia, Illinois, Washington, Colorado, New York, Tennessee, District of Columbia and Georgia). QuickMed owns and operates various websites, such as https://www.quickmedca.com/, https://www.quickmeddx.com/. Felix Huettenbach is the CEO of QuickMed.

3.     At all times herein mentioned, FUNDAMENTUM HEALTH, INC., is and was a Delaware corporation, ("Fundamentum") that is authorized to conduct business in California and is located in Venice California.   Felix Huettenbach is the CEO of Fundamentum.

4.     Plaintiff is informed and believes that at all times herein mentioned, FELIX HUETTENBACH, ("Huettenbach") is and was an individual that resides in Venice, California.   He is the CEO, founder, and majority shareholder of Same Day, QuickMed and Fundamentum.   As stated herein, he has conducted business in Los Angeles County.

5.     At all times stated herein, SDI LABS, INC, is and was a California corporation ("SDI") located in Garden Grove, California.   SDI operates a medical laboratory.

6. At all times herein mentioned, said Defendants, and DOES 1 through 50, inclusive, and each and every DOE in between, were and now are individuals, corporations, partnerships, sole proprietorships, joint ventures or associations duly licensed and/or organized and existing under and by virtue of the laws of the State of California and are affiliated with the other Defendants named herein, and bear liability for the acts complained of in this complaint in the same fashion as those Defendants.

7. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants sued herein as DOES are responsible in some actionable manner for the events and happenings herein alleged, and thereby legally causing the injuries and damages to the Plaintiff as hereinafter set forth.

8. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names. Plaintiff will amend the complaint to allege the true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged.

9. Plaintiff is informed and believes that Defendant Huettenbach and defendants  Same Day, QuickMed and Fundamentum are, and at all times herein mentioned were, the alter egos of Defendant Huettenbach and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between defendants such that any separateness between them has ceased to exist, in that defendant Huettenbach completely controlled, dominated, managed, and operated the corporate defendants and intermingled the assets of each to suit the convenience of defendant  Huettenbach by placing the fixed assets of defendant  SDI in the name of defendant  the corporate defendants in order to evade payment of the obligations owed to creditors of defendants Fundamentum, QuickMed and Same Day.

10. Plaintiff is informed and believes that Defendants Fundamentum, Same

**FIRST AMENDED COMPLAINT**

Day and QuickMed is, and at all times herein mentioned were, a mere shell, instrumentality, and conduit through which Huettenbach carried on his/her business in the corporate name exactly as he had conducted it previous to incorporation, exercising complete control and dominance of such business to such an extent that any individuality or separateness of the corporate defendants and defendant Huettenbach does not, and at all times herein mentioned did not, exist.

11.    Plaintiff is informed and believes that Defendants Same Day, Fundamentum and QuickMed are, and were at all times herein mentioned, agents of each other and Defendant Huettenbach.

12.    Jurisdiction and venue are proper in this court as the case relates to a violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*

## **GENERAL FACTUAL ALLEGATIONS**

A. <u>People v. Same Day Health: Judgment and Injunction Against Same Day Health and Felix Huettenbach for Unlawful Conduct</u>

13.    To the public during the COVID 19 pandemic, Same Day was known as a COVID 19 testing company that had 55 testing sites throughout the country, with 16 locations in Los Angeles County, including five in city of Los Angeles.

14.    On **April 20, 2022**, the Los Angeles City Attorney and District Attorney filed a complaint against Same Day and Huettenbach, <u>People v. Same Day,</u> et al case # 22STCV13180 (the "Action"), making several allegations including that they falsely advertised that test results would be provided to customers within 24 hours, knowing that it couldn't make that guarantee and they falsified and forged COVID-19 test results to at least 500 customers when it couldn't provide real results within 24 hours. It was also alleged that Same Day would manipulate old PDF lab reports from previous tests to forge the results. It was also alleged that Same Day "unlawfully targeted insured consumers, paid illegal kickbacks and submitted fraudulent claims for telemedicine consults."

15.    On **April 29, 2022**, a final judgment and permanent injunction was

formally entered against Same Day and Huettenbach in the Action and a true and correct copy of the final judgment and permanent injunction is attached hereto as Exhibit "1" and incorporated herein as fully set forth.

16.   Same Day and Huettenbach were enjoined from many acts including engaging in unlawful business practices related to the false or misleading advertisement or sale of any COVID-19 testing service, including but not limited to making any untrue or misleading claims, which are known, or which by the exercise of reasonable care should be known, to be untrue or misleading; about the Turnaround Time for delivery of results from a COVID-19 Test; the accuracy of any COVID-19 Test; and the authenticity, provenance, accuracy, or reliability of any COVID-19 Test result or Laboratory Report.

17.   Same Day and Huettenbach were also enjoined from engaging in unlawful business practices, in violation of Penal Code section 502, by fraudulently, unlawfully or without any required authorization using any data in order to engage in or execute any scheme or artifice to defraud, deceive, or extort or wrongfully control or improperly obtain money including but not limited to altering, with the intent to defraud, any data, digital.

18.   **Huettenbach was specifically enjoined from having database/login credentials that would allow for direct access to any Medical Record, including but not limited to test results and Laboratory Reports, belonging to or associated with any of Same Day 's customers or any entity or individual seeking services from Same Day** .

B.   Same Day Offers to Purchase SDI and the Parties sign an Non-Disclosure Agreement

19.   On or about **August 19th, 2022**, Same Day reached out to a business broker("Broker") that specialized in the sale of medical labs.   Same Day showed interest in purchasing SDI labs which was listed at ten million dollars.

20.   On **August 23, 2022**, a mutual confidentiality and non-disclosure

agreement ("NDA") was signed by Same Day and SDI. A true and correct copy of the NDA is attached hereto as **Exhibit "2"** and incorporated herein as though fully set forth.

21.    Same Day agreed to keep all Confidential Information in the strictest of confidence and not to disclose or reveal any Confidential Information to any person (other than such Representatives of the Receiving Party who are actively and directly involved in the discussions or the evaluation of the Business Purpose and who have a need to know such Confidential Information for the purpose of evaluating the Business Purpose and who have agreed to keep such Confidential Information confidential in accordance with the terms and provisions of this Agreement); (ii) not to use the Confidential Information for any purpose other than in connection with the Business Purpose including, but not limited to, reverse engineering, de-compiling, disassembling, altering, duplicating, modifying or creating derivative works therefrom; and (iii) not to disclose to any person (other than such Representatives of the Receiving Party who are actively and directly involved in the discussions or evaluation of the Business Purpose and who have a need to know for the purpose of evaluating the Business Purpose and who are have agreed to maintain in confidence the information disclosed hereunder in accordance with the terms and provisions of this Agreement), the fact that discussions are taking place with respect to the Business Purpose (including the status and terms of such discussions) or the fact that Confidential Information has been or may be made available to the Receiving Party and/or its Representatives

22.    The NDA provided that all Confidential Information taken would have to be returned or destroyed upon 10 days written notice.

C. Huettenbach Does not Accurately or Completely Explain the People v. Sameday "Settlement."

23.    On **September 8, 2022**, SDI' President Ozman Mohiuddin ("SDI President") questioned Huettenbach about the news that Same Day settled a fraud

case.    Specifically, SDI's President asked for an explanation of the case and settlement.  Huettenbach downplayed  both the case and settlement. He stated that he settled a case, but it was a Doctors fault and that he only settled the case to close the issue as it was not worth litigating. SDI's President further inquired about false Covid-19 test result reporting for which Huettenbach explained that "it was peak season, the testing volume was too high (more than 500,000 tests) and an error rate of 500 tests was a minor error" which now he wants to overcome.

24.    Huettenbach did **not** mention that it was also alleged by the Los Angeles City Attorney and District Attorney that Same Day "unlawfully targeted insured consumers, paid illegal kickbacks and submitted fraudulent claims for telemedicine consults."

25.    Huettenbach **did not** mention or disclose that there was a judgment or permanent injunction against BOTH him and Same Day.  Huettenbach **did not** mention that the permanent injunction could inhibit or preclude the involvement of Same Day or Huettenbach in the purchase, operation, or management of SDI. Huettenbach **did not** mention that Same Day and Huettenbach were subject to ongoing monitoring by the City Attorney and District Attorney.

D. Chronology of Confidential Proprietary and Trade Secret Information is Transferred by SDI to Same Day and its affiliate Companies.

26.    On **September 15, 2022**, Huettenbach and the Same Day employees visited SDI for the due diligence process. SDI disclosed confidential trade secret information which included the SDI testing menu and compatibility with turnaround times (TAT), technology and data, clinical and laboratory software, Lab OS SDI's in-house Laboratory Information Management System (LIMS), future testing goals, R&D, Lab Developed tests, compliance, sales and marketing, supplier and vendor contracts, Insurance payor in-network contracts, billing and finance details.

27.    On **September 16, 2022**, SDI's President met with Huettenbach at a building in Los Angles wherein the outer logo stated "QuickMeddx" but inside there

were Same Day Health posters. In that meeting, Huettenbach introduced himself and he told SDI's President that he owns QuickMeddx along with Same Day. He represented that he was "into the wellness business along with COVID-19 testing."

28.    Huettenbach claimed he received almost 5000 patients per day altogether from all his Same Day Health Clinics locations whereas in the peak season they test almost 20,000 patients per day. In this meeting,

29.    On **September 17, 2022**, Huettenbach represented that closing on the sale of SDI would close in 3 to 4 weeks.  Huettenbach knew that his representation would induce SDI to further divulge all of its trade secrets.

30.    On **September 18, 2022,** Huettenbach shared the first draft of the term sheet that identified QuickMed dba QuickMeddx as a buyer, which Plaintiff is informed and believes suggests that Same Day and Felix knew that they have to use QuickMed as using Same Day as the acquiring entity would attract attention by the Monitor designated in <u>People v. Same Day</u>.

31.    On **September 22, 2022,** Jeff Nelson from Same Day organized a meeting involving SDI proprietary, confidential and trade secret information regarding inventory management and Intelligent Billing[1] with the SDI and Same Day teams. SDI advised that no one could take screenshots or take any of the information that was being presented that day.

32.    In violation of SDI's instructions, Jeff Nelson took screenshots of SDI's billing trade secrets without consent. During the meeting on September 9, the SDI team discussed SDI Lab's technological and economic infostructure, SDI's proprietary mobile lab unit, SDI's in-house lab OS (Laboratory Information Management System LIMS), digital lab assistance application (Mobile App), SDI's in-house software GateKeeper Version 2.0, inventory management and intelligent billing. On **September 23, 2022**, SDI answered questions for Same Day regarding

---

[1] (Proprietary software for medical insurance billing for lab testing)

SDI Labs billing relating to in-network insurance payor contracts.

33.     A special drop box was created to include all the SDI confidential insurance contracts to answer Same Day's questions about SDI Labs in-network insurance billing contracts upon the request of Felix.

34.     On **September 22, 2022**, Huettenbach talked about the valuation of the acquiring company.   Huettenbach sent an excel sheet of the valuation of the acquiring company. Huettenbach claimed that his company's revenue was approximately $200,000,000.00. He claimed that his valuation of his company, Fundamentum, would be worth $250,000,000.00 based on revenue.   Huettenbach then claimed the goal was to have a billion-dollar company in the next few years.

35.     At that time SDI had most insurance payor in-network contracts, CLIA/CAP licensure, instrumentation, minority owned status, mobile lab unit would be provided as an asset, and no real debt.

36.     Given the representations made by Huettenbach on **September 22, 2022**, SDI felt comfortable enough to discuss Confidential Information such as the software license services opportunities for direct to consumer, patient intake at multiple locations, digital lab assistant (DROID) mobile application, and Gatekeeper Software.  SDI revealed research and development of lab developed tests for DTC of regulatory approved tests comprising of EUA approved at-home rapid antigen test, it's selling pricing and software service fee.

37.     Huettenbach wanted QuickMeddx claims to be reviewed by SDI Labs which was not part of the contemplated transaction.  Huettenbach wanted SDI s' billing company, Intelligent Billing, to handle the claims.

38.     SDI was concerned that the deal was not closing but a lot of SDI trade secret information was flowing to Same Day and Huettenbach's team. So, on **September 29, 2022**, SDI's President sent Huettenbach and his team a deal structure to ensure the timely acquisition of SDI. Huettenbach responded with details of how to close the deal which included producing the financials of Same Day and

QuickMed. However, oddly, on that same day, Huettenbach revealed a spreadsheet of a company known as **Fundamentum. Although not disclosed to SDI at the time, Fundamentum** did not exist but later Fundamentum was designated as the company to acquire SDI.

39.    **On October 11, 2022**, Huettenbach stated that "based on the language used [in the proposed term sheet for the SDI acquisition] it appears that we are trying to do an asset purchase, which I am confused by. To inherit the insurance contracts, we need to take over the entity (share purchase)."

40.    QuickMed was dropped as the acquisition company and was replaced by a yet to be formed company, Fundamentum.

41.    On **October 18, 2022**, Huettenbach, his staff, the Broker and SDI's team had an in-person follow-up meeting at SDI to discuss the terms of the term sheet. Meanwhile, Michael Savvides from Huettenbach's team, reached out to Sumi Thomas and Yashashree Shende of SDI and who then shared SDI's current testing methodology and how SDI used an open systems architecture, where SDI used instruments that are not bound to a particular reagent, which in turn reduced price to a great degree and made the testing process feasible while maintaining the quality of the test. SDI's team also shared with Mr. Savvides the COVID-19 IFU that SDI Labs currently uses.

42.    On **October 26, 2022,** Huettenbach wanted SDI Labs to integrate SDI's software with BerryDx, so that they can send 4000 samples per month. This could not be accomplished until there was a viable lab to lab service agreement between the two labs. Additionally, Huettenbach asked his team members to work with the SDI team on the SDI Labs Software integration part.

43.    On **November 1, 2022** SDI had an SDI-BerryDx integration Google meeting for Covid-19 testing in which QuickMeddx employees met with SDI employees. On **November 8, 2022** SDI completed full API integration required for COVID-19 testing between Berry DX's software application and SDI Lab's

GateKeeper Software application.

44.    On **November 15, 2022**, as expected after the full software integration, the first batch of COVID-19 samples (4k samples for the month of November) was supposed to come, however, the operation was appropriately aborted as the term sheet was not signed. Again, there was no lab-to-lab service agreement yet as the sale had not been completed. Again, it would not be complaint with the law to proceed without a lab-to-lab service agreement.

45.    On **November 17, 2022**, full software integration started.  Shortly thereafter, there was a dispute as Huettenbach, and his team wanted third party approval for change of ownership of all in network health insurance payor contracts which SDI do not want to occur. Such contracts were very difficult to procure at that time and had economic value.  SDI President felt that Huettenbach crossed the line and thus SDI wanted to pull out of the deal given the risk for third party notification for change of ownership.   SDI President, Mr. Mohiuddin, said that he wanted to pull out of the deal and that he wanted the return or destruction of his company's proprietary information.

46.    Huettenbach made statements intended to convince SDI that the deal should still go through.  On **November 21. 2022**, Heuttenbach stated that he knew that the change of ownership notifications would harm SDI if Same Day pulled out of the deal. He assured SDI that he is willing to adjust the terms of the deal so that this does not happen. He agreed that Same Day would place $2.5 million in Escrow upon signing of the Term sheet and authorize another 2.5 million in stock to be transferred to Escrow upon closing. The only contingency of closing that Huettenbach assured SDI was that SDI notifies insurance payors as required per respective contract for the change of the ownership and continue to cooperate with Same Day for the ownership transfer that the payor would require. Furthermore, he assured SDI that the closing would occur 30 days after the payor notifications are sent, regardless of the outcome of those notifications.

E. The Term Sheet is Signed

47. Based on the representations of Huettenbach, on **November 30, 2022**, SDI signed a term sheet ("Term Sheet") wherein Fundamentum would acquire SDI on the terms and conditions set forth in said term sheet. Unbeknownst to SDI at the time, Fundamentum was not conducting business and had only been incorporated on November 29, 2022. **The Term Sheet locked SDI into dealing exclusively with Fundamentum**. The agreement to deal exclusively with Heuttenbach and his companies was a change in position based on Heuttenbach's representations that the deal was done but for the contingency of notifying insurance payors. At the time, SDI had other reasonable offers and suitors. SDI did not deal any further with potential purchasers as a result of the representation by Heuttenbach that the deal was done but for the single contingency.

48. The Term Sheet provided payment as follows: "$3,500,000.00 of cash (the "Cash Consideration"), and (ii) 100,000 shares of common stock of Fundamentum which represents 0.81% of the expected fully diluted capitalization of Fundamentum as of the Closing Date." Unbeknownst to SDI, Fundamentum was just incorporated, and Plaintiff is informed and believes that Fundamentum had no assets and had not conducted any business as of yet.

49. Huettenbach then verbally and in writing assured SDI's President that the purchase of SDI by Fundamentum was done with no real closing contingencies.

50. On **December 5, 2022**, based upon the representation by Huettenbach that the acquisition deal was done and upon his request and instruction, SDI sent their prepared notification letter to insurance payors to the in-house counsel for Same Day and Huettenbach for their review prior to sending to the carriers.

51. On **December 6, 2022, at or about 2:26 p.m.,** Felix Heuttenbach texted Mr. Mohiuddin that he agreed that the deal for the purchase of SDI was complete. He said that Fundamentum has entered into an agreement to purchase SDI and that this news was to be shared with all SDI employees. Based on the

representations of Mr. Heuttenbach that the deal was done, including the earlier representation that the only contingency was the insurance notifications, and the representation that the deal was now done, SDI sent Defendants their protected client list containing critical contact information for the insurance payors. This information allowed Defendants to charge insurance companies for the testing that SDI had previously performed.

52.    On **December 7, 2022,** Same Day's counsel insisted that SDI send out the form notice letter to insurance payors.  In reliance on the representation that the deal was done, SDI complied and also sent out the notification letters.

F.    <u>Huettenbach publicly declares he is the owner of SDI and then Steps Up the Flow of Confidential Information to Same Day and its Affiliates</u>

53.    On **December 9, 2022**, Huettenbach announced to the SDI employees via video conference that **he is the owner of SDI** and that everyone has jobs and that they must work with Fundamentum which was created November 29, 2022.  At or about the same time, Heuttenbach, Same Day and Fundamentum funded escrow a portion of the purchase price.

54.    Also in reliance on the representations of Mr. Heuttenbach that the deal was done, on **December 9, 2022** the change of ownership notifications that had been previously provided to Defendants' counsel on or about December 5 (discussed above), were sent to the insurance carriers upon the urgent insistence of Same Day and Huettenbach.  This was an event with incredible ramifications for SDI as SDI had been thoroughly convinced by Huettenbach and his team that the sale was closed as escrow had been funded so there was no longer a risk to SDI to send the change of ownership notification out to insurance payors.  Huettenbach made it clear that sending the subject notifications and waiting for 30 days was merely the last administrative detail for the sale to close.

55.    SDI relied on those representations made by Huettenbach so said notifications were sent as requested. The notifications were sent out to the insurance

contacts that make up the protected client list that was provided to Defendants on or about December 6. This client list was *not* provided to Defendants prior to the representations that the deal was done, despite other trade secret information being shared between the parties under the Non-Disclosure Agreement.

56. Also, in reliance of Huettenbach's representation that the deal was done and that he was the owner of SDI, on **December 10, 2022**, SDI shared the tests menu of COVID-19, Flu a, Flu b, RSV Combo test in a group text between Huettenbach and his team.

57. On **December 14, 2022**, upon request of the Same Day Team, and in further reliance on the representation that the deal was done, SDI provided to Same Day additional trade secret customer list with contact information (186 customers).

58. On **December 15, 2022,** Same Day, without the permission of SDI, copied SDI's website and other proprietary information and posted it online: https://www.prnewswire.com/news-releases/sameday-health-launches-single-swab-test-for-covid-19-flu-and-rsv-301704617.html

59. Plaintiff is informed and believes that Quickmed, without permission of SDI, copied SDI's website and other proprietary information and posted it online: https://www.quickmedca.com.

60. Plaintiff is informed and believes that Sameday, without permission of SDI, copied SDI's mobile application format and the information contained therein https://www.sameday-testing.com.

61. Gabriel Reches from Defendant QuickMeddx reached out to the President of SDI in an email **December 16, 2022** copying Yashashree Shende from SDI Labs Inc., Jason Balovlenkov-Smith from 911 Health, Jeff Nelson from QuickMeddx and Timofei Bondarev from BerryDx requesting SDI Labs Software integration for processing the samples for RSV and Influenza Combo Panel Test and discussing the documentation required for the upcoming partnership. In further reliance of Huettenbach's declaration that he was the owner of SDI and that the sale

1    was complete, the information was provided.

2        62.    Also on **December 16, 2022**, QuickMed contacted SDI and stated that

3    the 911 lab, which is apparently affiliated with Quick Med, has informed QuickMed

4    that they plan to offer RSV + Influenza (A & B) panels through insurance. The

5    representative of QuickMed stated the following to the President of SDI: "we'll look

6    to you to share the assay that will be used to process this panel so that we can include

7    that in the lab report."    Based on the representations of Mr. Huettenbach, SDI did

8    produce the request assays.

9        63.    On **December 19, 2022**, SDI then also revealed confidential

10   information relating to  the SDI Lab's finance & accounting processes, AR billing by

11   Insurance provider, Payroll processes and Inventory accounting to Huettenbach's

12   team

13       64.    On **December 21, 2022.** Huettenbach's team met with SDI team

14   members Sumi Thomas and Yashashree Shende to discuss more trade secret

15   information including reagent costs and a spreadsheet entitled SDI LDT Reagent

16   Cost Analysis.xls.

17       65.    On **December 22, 2022,** Matthew Perasso emailed Sumi Thomas from

18   the SDI team to help them design a possible validation testing plan menu depending

19   on SDI existing instrumentations. Information was uploaded in Dropbox as

20   spreadsheet titled 'Instrument Test Menu &Validation Workflow.xls'

21       66.    On **January 3, 2023,** Gabriel Reches of the Same Day team texted SDI

22   employee Yashashree Shende, to obtain a Netflix SLA (Lab Service Agreement) and

23   requested signatures from SDI's President. Furthermore, Mr. Reches requested API

24   access for BerryDx to SDI Lab's GateKeeper. The SDI President signed Pandadoc

25   agreement for Netflix.  This meant that Defendants were able to perform testing for

26   the company Netflix.  During the COVID-19 pandemic, it became important for film

27   and tv producers to have on-scene rapid testing so as not to slow down production.

28   Based on the representations of Heuttenbach that the deal for SDI had been

1   completed, SDI President, Mr. Mohiuddin, signed the Netflix LSA.

2       67.   **On January 4, 2023**, upon Same Day's request, SDI sent Same Day the

3   SDI monthly expense budget in an email.  Also on that day, Yashashree of SDI

4   texted to Mr. Reches of Same Day SDI's saliva collection method details that were

5   shared for the Netflix Lab Service deal. This was data necessary for the performance

6   of the contract with Netflix that was handed over in reliance on Mr. Heuttenbach's

7   continued representation that the deal with SDI and Defendants was done.  In the

8   meanwhile, SDI's IT team along with SDI's employee Yashashree Shende worked

9   on sharing QR codes with Same Day's team in an e-meet including Timofei

10  Bondarev, Vince Roy, Oscar de Arriba, Cristian Alverez from BerryDx and Jeff

11  Nelson from QuickMeddx to order COVID-19 samples through API integration.

12  The QR codes are found on the boxes of the sample collection kits.  The QR codes

13  help enable efficient tracking of the samples that aids in processing time.  Integration

14  was completed on January 10, 2023, and Yashashree sent an email **01-06-2023 to**

15  Gabriel Reches with signed Lab Service Agreement for testing Hollywood SDI SLA

16  20-400 samples per month.

17      68.   As of **January 9, 2023,** Heuttenbach approved the release of part of  the

18  purchase price for SDI that had been held in escrow.  SDI never received the entire

19  purchase price.  Plaintiff is informed and believes that Huettenbach was satisfied

20  with the transfer of SDI's trade secrets to the extent that he knew this transaction was

21  irreversible.  Based on that belief which was shared with SDI, Huettenbach, on

22  behalf of Fundamentum and his  new declared company, SDI, released funds to SDI

23  to effectively consummate the sale.

24      G.   Escrow Agreement and Delays in Closing Develop after Confidential
25           Information is Obtained and Used by Same Day and its Affiliates

26      69.   On **January 9, 2023**, SDI and Huettenbach, on behalf of Fundamentum,

27  signed an agreement and escrow instructions wherein it was acknowledge that

28  "aggregate    funds    of    Three    Million    Five-Hundred    and    Four    Thousand

($3,504,000.00) Dollars pursuant to the parties TERM SHEET FOR THE POTENTIAL ACQUISITION OF SDI LABS, INC. dated November 30, 2022 and a Stock Purchase Agreement to be provided and any amendments thereto between Fundamentum Health (BUYER) and SDI Labs, Inc. (SELLER) .  A true and correct copy of the Escrow Agreement and Instructions ("Escrow Agreement") dated January 9, 2023, is attached hereto as Exhibit "3" and incorporated herein as though fully set forth.

70.    The Escrow Agreement authorized the immediate release of the sum of Two Million Seven Hundred Eighty-Six ($2,786,000.00) Dollars payable to the Seller (SDI Labs, Inc.).

71.    On **January 9, 2023**, the Broker stated, that "**we must have effective closing on 01-10-2023**. The team should sign the Escrow Closing Instructions, SDI must sign the closing bill of Sales document that he attached, the buyer shall deposit another $504,000 to the Escrow and deposit another $150,000 (or more) for operating the monthly business expense as discussed with Felix. After the closing, the remaining documents could be signed (definitive agreement, officer's resignation, board meeting minutes, issuance of SDI Lab's share certificates, and other issues related to property and equipment."

72.    The Broker then sent an email **January 10, 2023** to Same Day's CFO, CEO, in-house counsel, Jeff Nelson and SDI's President, stating that he just received a message that the Same Day that it unilaterally stopped release of funds from escrow to the SDI, and most importantly has stopped funding the SDI checking account as per term sheet and the verbal agreement between the parties as the final definitive Stock Purchase Agreement has yet not been signed.

73.    The Broker further stated that "holding of funds will breach all plans that we have agreed upon. Whereas the buyer has been provided with a proposed draft of the definitive agreement for 2 months without the buyer proposing any alternative or objections."    Therefore, the broker proposed that the purchase

agreement be signed "today" (January 10, 2023) and release $150,000 to SDI checking account just for the sake of operational business cost as this delay is causing harm to the business.

74.     SDI's President weighed in on the sudden delay by stating to Same Day that 'meanwhile your team members have already started using SDI assets, financials, HR, intellectual property and even started marketing directly to SDI customer list."

75.     SDI also informed the Same Day team that "the only term mutually agreed for release of funds from Escrow was 30 days' timeline form notification to the insurance payors, which we have provided with proof for 12-10-2022. This leaves us in a vulnerable and in a compromising position with unnecessary delay on release of funds from escrow. As agreed, please send instructions to release funds with a signed bill of sale agreement. Post release of funds you can take your time extension for more post-closing documents. Please confirm this is an acceptable approach."

76.     Huettenbach replied by stating that that he would participate in a call. The call occurred on **January 10, 2023**, and Same Day and SDI agreed that the closing shall occur after the final Stock Purchase Agreement is signed and this should happen no later than January 13, 2023. Same Day agreed to deposit $150,000 for SDI's business operational cost and another $504,000 to escrow for closing the funding purposes. Buyer was to propose new/modified corporate documents by **January 13, 2023**.

77.     Based on such assurances, the confidential information continued to flow from SDI to the Same Day team in anticipation of closing on **January 13, 2023**. Afterall, the terms were agreed, and the signing of the agreement was a mere formality at this point.

78.     On **January 16, 2023**, the Broker stated to the Same Day team that "we received a 60-page long [purchase] agreement in which the pricing is wrong and

1    have additional contingencies which are not mentioned in the Term Sheet."
2    Therefore, the Broker suggested that the closing be made on an easier version of the
3    agreement.  The Broker issued a contingency removal and the broker called for a
4    closing on January 19, 2022. This contingency was not signed by Huettenbach.

5        79.    Fundamentum continued to push a complicated reverse triangular
6    merger agreement which was unconscionable.  It seemed like suddenly something
7    happened to stop the momentum of this transaction.  SDI questioned why this
8    agreement was not produced in early December before all the Confidential
9    Information was provide to and used by Same Day.

10       80.    On **January 18, 2023**, Fundamentum explained that the reverse
11   triangular merger transaction had to be used as it was suspected that SDI's President
12   was not the only shareholder as evidenced by a capitalization sheet indicating several
13   other owners existed in the drop box created by the Broker. SDI explained the
14   capitalization sheet was prepared for a transaction that was not completed and thus
15   SDI was still exclusively owned by its President.

16       81.    Notwithstanding the foregoing, the Same Day team chose not to believe
17   the representations of SDI's President and felt that the reverse triangular merger was
18   thought to be the safest way for Fundamentum to complete the transaction.  It is
19   notable that capitalization sheet was in the hands of the Same Day team before the
20   Term Sheet was executed on **November 30, 2022**.

21       82.    Also on **January 18, 2023**, the Same Day team requested, and SDI
22   agreed on inter-lab Validation of the Bioeksen RPP Panel (23 organisms).
23   Representative from Bioeksen sent by Same Day's  team for the validation of their
24   used kit completed validation at SDI's facility on January 27 and 28, 2023. SDI Lab
25   tech training on the RSV combination test sent from Bioeksen were also scheduled.

26       83.    On **January 20, 2022**, the Broker brought this to Huettenbach's
27   attention copying officers of the Same Day team and SDI's President, that Same
28   Day's team is approaching Seller's existing clients as proclaimed new owners of SDI

already based on representations of Fundamentum and that is a breach of NDA agreement of the NDA.

84.    The Broker also suggested cooperating in finishing the Definitive Agreement as soon as possible as the delays are damaging for the business, its employees, and customers.  However, SDI faced a large and confusing agreement that was unconscionable and required a lot of time to digest, understand and edit. Most importantly, the new merger agreement was inconsistent with the original Term Sheet and had numerous onerous additional conditions.

85.    SDI advised the Same Day team that "this [situation] is leaving the company [SDI] and its employees' future in limbo, we are at a crossroads and directionally confused how to move forward in regard to employees, suppliers and customers.  We started in a positive and cooperative manner."

86.    Even though SDI believed that the transaction was complete, SDI sought out special counsel to address the strange change in direction by Fundamentum in attempt to close the transaction as soon as possible.

87.    After attempting to persuade that a stock purchase would be an easier route to effectuate the sale of SDI, SDI relented and took the time necessary to educate the SDI team on the details of the lengthy merger agreement.  The submitted reverse triangular merger agreement was also incomplete and several key documents were missing as of **February 6, 2023**.

88.    By **early February** SDI's President was under a lot of stress at this time as he worried that his company would fail while waiting for the transaction to be completed. Customers, employees, and insurance payors were complaining about the prolonged delay in Fundamentum taking over.

89.    On **February 5, 2023**, SDI sent over a draft of the Merger agreement which contained the following paragraph drafted by SDI's attorney under the heading or Representations and Warranties:  "Parent warrants and represents that the 100,000 shares of common stock of Fundamentum Health, Inc. to be issued to

Company are valued by Purchaser at $2,025,000.00 and represents 0.81 percent of the expected fully diluted capitalization of Fundamentum Health, Inc. as of the Closing Date.  The stock issued to Company is not subject to any encumbrances or restrictions other than what is stated in the bylaws of Parent."  Said Paragraph was later rejected by Fundamentum.

90.    After several meetings between counsel for Fundamentum and SDI, on **February 22, 2023**, SDI's counsel sent Fundamentum (1) a proposed "final" redline draft of the Merger agreement; (2) the partially executed Restrictive Covenant Agreement and Consultant Agreement; (3)  fully executed corporate documents; and (4) the Secretary of State statement of Good Standing for SDI Labs, Inc  SDI's counsel also request Fundamentum send the remaining documents relating to the merger,  including the schedules, exhibits, pre-closure statement  and stock transfer agreement.   He also requested the forms for the CHOW (change of ownership) requirements for state of California, CLIA laboratory services, CAP, Center for Medicaid and Medicare Services, and Private insurance companies and the W-9 from Fundamentum.

91.    The next day, the response from Fundamentum's counsel was "Thanks, John. We are reviewing and will get back to you on scheduling a call to knock out any remaining issues." Counsel for Defendants did respond to the submitted documents and discussions ensued about the documents.

92.    On **March 2, 2023,** the partially executed merger agreement along with other documents necessary for the transfer of ownership of SDI was submitted by SDI's counsel.

93.    On **March 8, 2023**, Mason Dragos of the Same Day team sent a text to SDI's President for a lab-to-lab reference agreement between QuickMeddx and SDI. Also Mr. Dragos mentioned that he will send some Same Day samples to SDI.

H.    <u>Fundamentum Claims it is Winding Down but also Claims it is "Reassessing" the Term Sheet</u>

94.    On **March 24, 2023**, SDI received an email from Fundamentum's counsel which stated:

> "**As you may have heard, over the last several weeks, certain events have occurred (namely, that Fundamentum is winding down its enterprise) that have led Fundamentum to reassess the non-binding terms contained in the Term Sheet.  The Term Sheet, which I'm sure you know, expressly states that the terms contained therein (other than those specifically identified as Binding Provisions) are non-binding in nature and do not operate to create or impose any legal obligation upon any party.  In other words, the parties are able to change/revise/reconsider any of the non-binding terms until the definitive agreements are entered into.  The non-binding nature of term sheets of this type are non-controversial, commonly utilized, and accepted by courts across the country**.

95.    The foregoing was traumatic and shocking news but why was Fundamentum so defensive about the "non-binding" terms of the Term Sheet? Escrow was contacted by Fundamentum's counsel who stated that the parties were still negotiating. SDI wondered how that would occur if Fundamentum was already in the process of winding down while the CEO suddenly left Fundamentum and the United States!

96.    On **April 11, 2023**, SDI's attorney received a stern email from counsel for Fundamentum: "We have been instructed by our client to resolve this matter expeditiously given Fundamentum's current state and the baseless claims and allegations we were told Oz has made and continues to make against Felix [Huettenbach].  As such, we provided the terms of Fundamentum's counteroffer for review by Oz [SDI's President] and you in the email below.   Given the circumstances, we need Oz's response to Fundamentum's counteroffer by **5:00 p.m. PT on Thursday, April 13, 2023**.  If we do not receive Oz's response from you or Oz by such time, we will deem such failure to respond to be a rejection of our

counteroffer and termination of our discussions regarding the proposed transaction. We will then proceed as stated in our prior e-mail."

97.    Huettenbach had previously stated to SDI's President that they would work directly with each other to resolve this catastrophic problem. Plaintiff is informed and believes that SDI's Confidential Information was and is spread out to various Same Day affiliates.

98.    SDI employees were surprised about Fundamentum's decision to terminate negotiations after Huettenbach's declaration that he was the owner of SDI. The SDI employees were and are making arrangements to seek other employment as the attempted acquisition mortally wounded SDI. With what the Defendants did to SDI, it was no longer a marketable company to be sold for any price near the original purchase price.

99.    On **April 14, 2023**, SDI's attorney responded to the email from Fundamentum as follows:

"As I write this email, I am still with my client discussing what has transpired and what to do next.  My client has reached out to Felix on several occasions to resolve our dispute.  It was agreed that discussion to resolve this matter was to occur only between Felix and Oz.   Unfortunately, Felix had failed to respond to the serval attempts by Oz to talk about this matter.  It seems that Felix is out of the country, and he is not responding to OZ.  This causes us a lot of concern as I have just been informed that Fundamentum Health, Inc is no longer conducting business.  **This is a shock as we were very recently advised that Fundamentum was properly capitalized, and the stock offered to OZ had a value of at least $2,000,000.00."** (Emphasis Added).

100.   Even though Fundamentum's counsel stated in her **March 24, 2023** that "**Fundamentum _is_ winding down its enterprise**" she changed the story on **April 15, 2023** to state that "while you may have just learned that Fundamentum is _**contemplating**_ winding down its businesses.

101.   In her **April 15, 2023,** email, Fundamentum's counsel stated: "in any event, we understand from your email [cited above in paragraph 93] below that your client has rejected Fundamentum's most recent offer and decided not to proceed with the transaction.  As such we will proceed to instruct the escrow agent to release the funds held in escrow to Fundamentum and to close the account. It is unfortunate that the parties could not come to an agreement, however, Fundamentum **wishes Oz well in any future endeavors**."

102.   Not surprisingly, Osman Mohiuddin, the President of SDI, did not feel that Fundamentum put SDI in a position to have any "future endeavors" and he did not know if Fundamentum really ever existed.

103.   On May 1 and May 2, 2023, counsel for SDI sent counsel for Fundamentum two letters demanding the return or destruction of SDI's Confidential Information. The letters also stated that SDI is entitled to know if Same Day, its affiliated companies, partners, vendors, contractors, or customers have used and is still using any of SDI's Confidential Information. If that has occurred, we expect an honest response indicating specifically: (1) what Confidential Information was used; (2) the name and contact information of the persons and entities that used or still uses the Confidential Information; and (3) the time period in which said Confidential Information was used. A true and correct copy of both letters are collectively attached hereto as Exhibit "4"and incorporated herein as though fully set forth.

## FIRST CAUSE OF ACTION

## FRAUD

### (Against Felix Huettenbach and Same Day Technologies, Inc.)

103.   Plaintiff incorporates paragraphs 1 through 103 as though fully set forth herein.

104.   On or about September 16, 2022, SDI's President met with Huettenbach at the QuickMeddx building in Los Angeles.

105.   SDI's President asked Huettenbach about a recent case against Same

Day that was in the news. Specifically, SDI's President asked for an explanation of the case and the settlement. SDI was prompted to make an inquiry due to a news report that stated Same Day had to pay a $22.5 million settlement to the City of Los Angeles for falsifying lab results.

106.   Huettenbach downplayed the settlement as he stated that it was all the fault of the doctor involved (Dr. Jeff Toll, a Los Angeles based doctor).  Huettenbach stated that he only settled the case to close the issue as it was not worth litigating.

107.   Huettenbach told SDI's President that the reporting about the false COVID 19 result was inaccurate and explained that "It was peak season, testing volume was too high (more than 500,000 tests) and an error rate of 500 tests was a minor error which he now looked to overcome.)."  As a result of the foregoing statements by Huettenbach, SDI's President was induced to believe the aforementioned representations by the CEO of a very successful company so the President of SDI accepted the representations of Mr. Huettenbachas being true.

108.   Huettenbach had a legal duty to tell the whole story. The truth is that Huettenbach did not tell the whole story to SDI's President, nor did he tell an accurate story.

109.   The truth was that there was no mere monetary settlement as Huettenbach and Same Day stipulated to both a judgment and an injunction as set forth in paragraphs 10 through 15 of this complaint.

110.   Huettenbach did not mention all or even most of the claims pending against Same Day.  For example, Huettenbach **did not** mention that both he and Same Day were accused of "unlawfully target[ing] insured consumers, pa[ying] illegal kickbacks and submit[ing] fraudulent claims for telemedicine consults" as set forth in paragraphs 10 through 15 of this complaint. Huettenbach **did not** mention to SDI's president that both he and Same Day are subject to many strict injunctions and ongoing monitoring by the City Attorney and District Attorney. Huettenbach **did not** mention that  a violation of the injunction in place could preclude the contemplated

purchase of SDI or cause Huettenbach to step down as the President and CEO of Same Day.

111.   The most egregious act of fraudulent concealment was that Huettenbach **did not** to mention that he personally was enjoined from having database/login credentials that would allow for direct access to any Medical Record, including but not limited to test results and Laboratory Reports, belonging to or associated with any of Same Day's customers or any entity or individual seeking services from Same Day.  Plaintiff believes that this fact was not reported by the media.

112.   Since Huettenbach intentionally undertook to tell only part of the story concerning the case and settlement, he had a legal obligation to Plaintiff to provide a complete and accurate statement of both the case and the settlement which were material issues since SDI planned to sell itscompany to Defendants. Furthermore, Heuttenbach's representation that the case against him and Same Day was the result of statistical error was an affirmative misrepresentation that required the disclosure of the additional, purposefully withheld facts.

113.   Heuttenbach made other misleading statements upon which SDI relied. On or about December 6 through 7, 2022, Mr. Huettenbach stated to SDI's President that the purchase of SDI would be complete upon SDI handing over the insurance payor information.  In reliance on these assertions, SDI revealed to Defendants their trade secret client list of insurance payors

114.   When Huettenbach made these representations, he did so in both his individual and professional capacity.  When Huettenbach made these representations, he made them with the intent to deceive and defraud SDI and to induce SDI to proceed in reliance on the representations in order for the sale of the SDI to be complete and in order to procure the trade secret information of SDI.

115.   Plaintiff, at the time the representations were made by Defendant at the time Plaintiff took actions herein alleged, was ignorant of the falsity of the Defendants' representations and believed them to be true and complete. In reliance

on these representations, Plaintiff was induced to and did provide Defendants with valuable Confidential Information that included Trade Secrets.  After SDI was told that the sale was complete, SDI handed over its client contact and insurance payor information.  After SDI was advised that the sale was complete, it agreed to the Netflix LSA. The loss of the customer list and insurance payor information resulted in lost business opportunities to SDI.  The signing of the Netflix LSA resulted in business loss to SDI.

116.  Had Plaintiff known the facts, Plaintiff would not have taken such action. The key fact that Huettenbach was specifically enjoined from having database/login credentials that would allow for direct access to any Medical Records, made the deal impossible.  How can the CEO operate a laboratory with out access to medical records? The Plaintiff's reliance on Defendants' representations was justified as Huettenbach was the chief executive officer of Same Day and the Same Day affiliates.

117.  As a proximate result of the fraudulent conduct of Defendants as herein alleged, Plaintiff expended money, time, and energy in producing confidential information and proceeded in the sale of a business that would not have proceeded had the Plaintiff known the complete truth as stated above.

118.  The aforementioned conduct was an intentional misrepresentation, deceit, and concealment of a material fact known to Defendants with the intention on the part of the Defendants to deprive Plaintiff of its confidential information, property and legal rights and thus causing injury. The Defendants' conduct was despicable and deprived Plaintiff of its valuable rights and assets. The conduct of the Defendants demonstrated a conscious disregard for the Plaintiff's rights so as to justify exemplary and punitive damages.

///

///

///

## SECOND CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

### CIVIL CODE SECTION 1710 (2)

### (Against Felix Huettenbach and Same Day Technologies, Inc.)

119.   Plaintiff incorporates paragraphs 1 through 118 as though fully set forth herein.

120.   The representations to the Plaintiff recounted above were false.

121.   When Defendants made such representations, they had no reasonable ground to believe they were true.

122.   The Plaintiff, at the time that these representations were made by the Defendants and at the time Plaintiff took actions herein alleged, were ignorant of the falsity of Defendants' negligent representations and believed them to be true.

123.   In reliance on these representations, Plaintiff was induced and did produce confidential information as described in detail in the complaint for damages.

124.   As a proximate result of the negligent conduct of the defendants as herein alleged, Plaintiff has lost its confidential information, employees and effectively its business.

125.   Plaintiff has sustained damages in an amount to be determined according to proof at the time of Trial.

### THIRD CAUSE OF ACTION

### FRAUD -FIRST COUNT

### FALSE PROMISE

### CIVIL CODE SECTION 1710

### (Against Felix Huettenbach and Same Day Technologies, Inc.)

126.   Plaintiff incorporates for incorporates paragraphs 1 through 149 as though fully set forth herein.

127.   On December 6 to 7, 2022, Heuttenbach told Mr. Mohiuddin that the sale would be complete upon the handing over of insurance payment information and

client contact information. On December 9, 2022, Huettenbach announced to the SDI employees and management via video conference that **he [Fundamentum] was the owner of SDI and that everyone has jobs and that they must work with Fundamentum**. On that same day, Huettenbach and Same Day insisted on change of ownership notifications to go out.

128.   Huettenbach privately explained to SDI's president that the deal to purchase SDI was done and that all parties should proceed as if the transaction has been completed.  In fact, Huettenbach, in his capacity as Fundamentum's CEO,  then released the escrow funds to SDI so that SDI received at least the cash deposit and payment but not the stock promised to SDI.  SDI reasonably concluded that the deal was done.

129.   The truth was that Huettenbach knew that the deal was not done, and Plaintiff is informed and believes that despite his promises, Huettenbach knew that the transaction would not be completed. The truth was that Huettenbach immediately needed SDI's Confidential Information for the benefit of his affiliated companies.

130.   In reliance on the representations made by said Defendants, SDI did in fact produce the trade secret information as detailed in the complaint for damages. On December 6 through 7, 2022, SDI handed over its insurance payor information after the representations were made and in direct reliance on the representations. SDI allowed insurance payment notification lists to be sent out in direct reliance on the representations.  On or about December 14, 2022, SDI handed over its list of 186 contacts in direct reliance on the representation that the sale was done.  In further reliance on these representations, SDI agreed to allow the Netflix LSA to go through. Each of these acts of reliance resulted in the loss of business opportunities to SDI and the loss of income. Shortly thereafter, word got out SDI's customers and to the insurance companies that  the SDI was in fact sold.

131.   When Huettenbach made the representations, he knew they were false and made these representations with the intent to deceive the Plaintiff to induce the

Plaintiff to produce its confidential information.

132.   Huettenbach made the representation in his capacity as chief executive officer of Same day and or QuickMed as Fundamental did not exist at that time.

133.   The Plaintiff, at the time the representations were made by the Defendants and at the time the Plaintiff acted as herein allege, was ignorant of the falsity of the Defendants' representations and believed them to be true. In reliance of these representations, the Plaintiff was induced to and did produce the confidential information as stated above.

134.   As a proximate result of the fraudulent conduct of Defendants Plaintiff has lost its confidential information, its business, employees, customers, insurance contracts and has incurred considerable costs and fees.

135.   The conduct of the Defendants was intentional misrepresentation, deceit and concealment of material facts known to the Defendants with the intention on the part of the Defendants of thereby depriving the Plaintiff of property or legal rights or otherwise causing injury and was despicable conduct that subjected the Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## SECOND COUNT

## NEGLIGENT MISREPRESENTATION

## CIVIL CODE SECTION 1710 (2)

## (Against Felix Huettenbach and Same Day Technologies, Inc)

136.   Plaintiff incorporates for incorporates paragraphs 1 through 135 as though fully set forth herein.

137.   When Huettenbach made the representation he owned SDI, he had no reasonable ground  to believe his statement was true and correct.

138.   Huettenbach's negligent misrepresentation induced the Plaintiff to produce its Confidential Information, including Trade Secrets, to Defendants.

139.   Huettenbach made the representation in his capacity as chief executive

**FIRST AMENDED COMPLAINT**

officer of Same Day and/or QuickMed as Fundamentum did not exist at that time.

140.    The Plaintiff, at the time the representations were made by the Defendants and at the time the Plaintiff acted as herein alleged, was ignorant of the falsity of the Defendants' representations and believed them to be true.

141.    In reliance of these representations, the Plaintiff was induced to and did produce the Confidential Information as stated above.

142.    As a proximate result of the fraudulent conduct of Defendants Plaintiff has lost its Confidential Information, its business, employees and has incurred considerable costs and fees.

143.    Defendants' negligent misrepresentation was a substantial factor in causing substantial monetary damages in an amount to be proven at the time of trial.

**FOURTH CAUSE OF ACTION**

**MISAPPROPRIATION OF TRADE SECRETS**

**(Against All Defendants)**

144.    Plaintiff incorporates paragraphs 1 through 143 as though fully set forth.

145.    Plaintiff was in possession of Confidential Information consisting of trade secrets ("Trade Secrets") as identified above and specifically in Exhibit "4."

146.    Plaintiff's Trade Secrets had an economic value in that they were used to own, operate and manage a clinical laboratory.  The subject Trade Secrets were used for human testing, organizing data and creating an efficient billing/accounting program which would provide any lab company with a financial benefit.  The subject Trade Secrets were created through the expenditure of significant time, capital and resources by Plaintiff.

147.    Plaintiff made reasonable efforts to ensure that the Trade Secrets remained secret by requiring those that needed to know about the Trade Secrets sign a Non-Disclosure Agreement ("NDA").  Furthermore, Trade Secrets were kept confidential by the Managers and employees of SDI who signed an employee confidentiality agreement.

148.   On or about September 15, 2022, Same Day signed an NDA and promised not to disclose or otherwise misappropriate Plaintiff's Trade Secrets. The flow of Trade Secrets started on or about September 16, 2022, and continued as stated in great detail in the paragraphs above. While Defendants procured some of the trade secrets during the agreed-upon due diligence review while Defendants were assessing the purchase of the company, Defendants improperly maintained dominion and control over the Trade Secrets when Defendants refused to return materials when demanded.

149.   The flow of trade secret information to Defendants increased after December 6 through 7, 2022, after Heuttenbach told SDI that the deal was complete. After that, SDI shared its software tests menu of COVID-19, Flu a, Flu b, RSV Combo test in a group text between Huettenbach and his team.   On or about **December 16, 2022**, Plaintiff shared SDI Labs Software integration for processing the samples for RSV and Influenza Combo Panel Test.

150.   Defendants also published SDI's website and other proprietary information without the permission of SDI, when they posted it online: https://www.prnewswire.com/news-releases/sameday-health-launches-single-swab-test-for-covid-19-flu-and-rsv-301704617.html and at   https://www.quickmedca.com. and at https://www.sameday-testing.com.

151.   Plaintiff is informed and believes that on or about **September 22, 2022,** and continuing thereafter, the Trade Secrets were sent to Defendants' affiliated companies and third parties in violation of the NDA.   Plaintiff is informed and believes that each named defendant has had and continues to maintain the Trade Secrets.

152.   The Trade Secrets stated in Exhibit 4 generally included but not limited to customer lists, customer information, customer pricing, customer primary contact information, proprietary software and software integration, proprietary clinical lab processes, vendor information (including contact and pricing such as the pricing and

use of specific reagents in testing) and the physical combo test that allows for COVID-19, Flu-A, Flu-B and RSV with one sample.  For that test, SDI developed a process by which a single sample can be used for all four viruses and the same sample can also be used for both a rapid test and lab test, thereby improving efficiency in time and cutting costs.  The physical test kit includes a process that allows it to be efficiently tracked by the proprietary software, including a QR code on the box that aids in tracking, which in turn increases efficiency.

153.   Plaintiff is informed and believes that said Trade Secrets were actually used by Defendants and third parties in violation of the NDA and oral instructions.

154.   Defendants used said Trade Secrets for the economic benefit of Defendants and other third parties without the permission of Plaintiff.

155.   As a proximate result of the misappropriation of the Trade Secrets that are identified above, said Trade Secrets have lost value and are no longer maintained as Trade Secrets.  As a proximate cause of Defendant's misappropriation of the Trade Secrets, Plaintiff has sustained damages in an amount to be determined according to proof at the time of trial.

156.   Through the acts discussed above, Defendants violated the California Uniform Trade Secret Act and the Federal Defend Trade Secrets Act.

157.   Plaintiff is entitled to all remedies provided at law, including remedies provided or allowed by Federal and State law for Defendants' misappropriation of Plaintiff's Trade Secrets. Therefore, Plaintiff will be seeking damages and injunctive relief in an amount according to proof at the time of trial.

## FIFTH CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH  ECONOMIC RELATIONSHIP

### (Against all Defendants)

158.   Plaintiff incorporates paragraphs 1 through 157 as though fully set forth.

159.   Plaintiff had an advantageous relationship with both customers and insurance payors in connection with SDI's business as a clinical laboratory.

160.  Plaintiff entered into written contracts with both its customers and the insurance payors in the industry.

161.  Defendants and SDI signed a Non-disclosure Agreement which contained a non-solicitation provision period. (See Exhibit "2.")

162.  Furthermore, Defendant Huettenbach agreed that he would not interfere with SDI's business.

163.  After Defendants were advised of the name, address and telephone number of each and every customer as well as the insurance payors and relevant contact information which was indeed confidential, Defendants negligently ignored all instructions and attempted to conduct business with customers, pester customers and make reckless remarks to customers that caused said customers to question SDI. For example, telling customers and insurance payors that SDI was owned by Fundamentum before the sale occurred was negligent and caused SDI to lose current and future business.

164.  Plaintiff is informed and believes that the Defendants had access to key customer contacts and used the confidential contracts to create business contacts for all defendants despite being advised not to solicit said customers.  This contact was annoying, unprofessional and disrupted SDI's business.

165.  As stated above, Plaintiff is informed and believes that Defendants may still be conducting business with said customers and insurance payors.

166.  Defendants' actions have severed Plaintiff's relationship with  186 individual clients and most of its insurance payor contacts, which has caused Plaintiff to suffer a substantial economic loss. Plaintiff is informed and believes that Defendant's actions will make it difficult to regain or continue business with these customers and insurance payors.  To date, Plaintiff has lost 186 different paying customers and insurance contacts.

167.  Plaintiff has been damaged by Defendants' negligent acts in amount to be determined according to proof at the time of trial.  The direct result of the loss of

these clients and insurance contacts has been a reduction in current revenue from the 186 clients on the client list that was handed over to Same Day and the insurance payor contacts that Same Day received in December of 2022, and an expected loss of future revenue from the same clients and insurance contacts...

## SIXTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONSHIP

### (Against All Defendants)

168.   Plaintiff incorporates paragraphs 1 through 167 as though fully set forth.

169.   Prior to August 23, 2022, Plaintiff had both a contractual and non-contractual economic relationship with numerous customers and insurance payors.

170.   On August 23, 2022 Defendants signed the NDA and agreed not to solicit Plaintiff's customers or insurance payers unless and until SDI was purchased by Defendants.

171.   Furthermore, Defendant Huettenbach agreed that he would not interfere with SDI's business.

172.   Defendants were aware of such third party contracts as Defendants conducted a due diligence of SDI's records as stated in detail above.

173.   Defendants intentionally disrupted the contracts and economic relationships cited above by contacting the customers and insurance payors to falsely inform them that Defendants owned SDI and that they should already start commencing business with Defendants.

174.   Plaintiff is informed and believes that Defendants immediately started poaching customers and insurance payors from SDI without authority or consent by SDI.   Defendants used Plaintiff's Confidential Information, including customer contact information to bother/solicit Plaintiff's customers and insurance payors.

175.   The effect of this disruption caused harm to SDI in several different ways. Some customers left SDI and some customers decided to temporarily hold off conducting business with SDI as there were mixed signals about the purchase of

SDI.

176.   Insurance payors began to question their relationship with SDI as the representations about the purchase of SDI by Defendants appeared to be untrue.

177.   Plaintiff lost a substantial amount of the business and revenues were significantly reduced. Due to Defendants 'intentional interference, Trade Secrets were stolen and some employees left which compounded Plaintiff's losses.

178.   The aforementioned acts were willful, oppressive, fraudulent and malicious in that Defendants were saying whatever was necessary to ensure that the customers and insurance payers were going to proceed with Defendants.

179.   To date, Plaintiff has lost 186 different paying customers and insurance contacts.   The direct result of the loss of these clients and insurance contacts has been a reduction in current revenue from the 186 clients on the client list that was handed over to Same Day and the insurance payor contacts that Same Day received in December of 2022, and an expected loss of future revenue from the same clients and insurance contacts.

180.   Plaintiff is furthermore entitled to punitive damages according to proof.

## SEVENTH CAUSE OF ACTION

### PROMISSORY ESSTOPEL

### (Against All Defendants)

181.   Plaintiff incorporates paragraphs 1 through 180 as though fully set forth.

182.   On December 6 to 7, 2022, Heuttenbach told Mr. Mohiuddin that the sale would be complete upon the handing over of insurance payment information and client contact information. On December 9, 2022, Huettenbach announced to the SDI employees and management via video conference that **he [Fundamentum] was the owner of SDI and that everyone has jobs and that they must work with Fundamentum**. On that same day, Huettenbach and Same Day insisted on change of ownership notifications to go out.

183.   Huettenbach privately explained to SDI's president that the deal to

purchase SDI was done and that all parties should proceed as if the transaction has been completed.

184.    The truth was that Huettenbach knew that the deal was not done, and Plaintiff is informed and believes that despite his promises, Huettenbach knew that the transaction would not be completed. The truth was that Huettenbach needed SDI's Confidential Information for the benefit of his affiliated companies.

185.    In reliance on the representations made by said Defendants, SDI did in fact produce the trade secret information as detailed in the complaint for damages. On December 6 through 7, 2022, SDI handed over its insurance payor information after the representations were made and in direct reliance on the representations. SDI allowed insurance payment notification lists to be sent out in direct reliance on the representations.  On or about December 14, 2022, SDI handed over its list of 186 contacts in direct reliance on the representation that the sale was done.  In further reliance on these representations, SDI agreed to allow the Netflix LSA to go through. Each of these acts of relieance resulted in the loss of business opportunities to SDI and the loss of income.

186.    The foregoing representations were in contrast to and contradiction to a previous letter of intent.

187.    Huettenbach reassured SDI's president that he must continue to deal privately with him to complete the transaction on paper, but for all intents and purposes the deal had been done and thus Huettenbach felt justified in claiming to the public that he was the owner of SDI as of December 9, 2022.

188.    SDI's president and staff believed the representations of Huettenbach tht the deal was done to be true and thus relied on said representations to their detriment.

189.    As a consequence, Defendants continued to produce Confidential Information which was ultimately used for the financial benefit of the Defendants and its related affiliate companies.

190.    The promise and assurance that the transaction had been completed was

not true and as a consequence, Plaintiff has been damaged substantially by way of loss of customers, insurance payers and employees. The misrepresentations by Huettenbach have caused damage to the business and embarrassment to SDI's management.

191.   Plaintiff has been damaged in an amount to be determined according to proof at the time of trial.

## EIGHTH CAUSE OF ACTION

### BREACH OF NON-DISCLOSURE AGREEMENT

### (Against All Defendants)

192.   Plaintiff incorporates paragraphs 1 through 191 as though fully set forth.

193.   On **August 23, 2022,** SDI and Same Day signed a Mutual Confidentiality and Non-Disclosure Agreement.  (See Exhibit "2".)

194.   Same Day and its agents agreed to keep all "Confidential Information" in the strictest of confidence.  Further Same Day and its agents agreed not to use the Confidential Information for any purpose other than in connection with the purchase of SDI.   Same Day and its agents were bound not to disclose the Confidential Information to anyone and was supposed to keep said Confidential Information safe from third parties. Same Day and its agents were bound to return the Confidential Information if the sale was not completed.

195.   Plaintiff had performed all conditions, covenants and promises required to be performed in accordance with the terms and conditions of the NDA.

196.   Plaintiff is informed and believes that on or about **September 22, 2022**, Defendants breached the NDA by exposing the Confidential Information to third parties and allowed these third parties to use the Confidential Information for business purposes.

197.   Plaintiff's Confidential Information has been disseminated and thus Plaintiff has been damaged.  Plaintiff is not aware of the full degree to which its proprietary information has been used by third parties.  But as an example, SDI

points to the transmission of materials to third-party BerryDX. On or about December 16, 2022, BerryDX was provided software integration materials for processing the samples for the Combo Panel Test.

198. On May 1 and 2, 2022, Plaintiff demanded the return or confirmed destruction of all Confidential Information within ten (10) days.

199. Defendants further breached the NDA by failing to return the materials to Plaintiff within ten (10) days of the demand.

200. Because of Defendants' breach of the NDA, Plaintiff has incurred damages and will seek an amount of damages to be determined according to proof at the time of trial.

## PRAYERS

WHEREFORE, Plaintiff prays judgment against Defendants as follows:

**For the First, Second, Third, Fifth, and Seventh Causes of Action:**

1. For general and special damages in an amount to be proven at trial;

2. For punitive and exemplary damages (Only as to Causes of Actions1 through 3)

3. For costs of suit herein incurred; and,

4. For such other and further relief as the Court may deem just and proper.

**For the Fourth Cause of Action:**

1. For general and special damages in an amount to be proven at trial;

2. For injunctive relief;

3. For costs of suit herein incurred; and,

4. For such other and further relief as the Court may deem just and proper.

**For the Sixth, and Eighth Causes of Action:**

1. For general and special damages in an amount to be proven at trial;

2. For costs of suit herein incurred; and,

3. For such other and further relief as the Court may deem just and proper.

1

Respectfully submitted.

2      Dated: October  2 , 2023         **MCMAHON LYNCH LAW FIRM, INC.**

3

4

5                      By: _____

6                            ROBERT J. LYNCH

7                            Attorneys for Plaintiff,
                            SDI LABS, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands a trial by jury in this matter.

3     Dated: October 2 , 2023              **MCMAHON LYNCH LAW FIRM, INC.**

4

5

6              By: _____

7                   ROBERT J. LYNCH
                   Attorneys for Plaintiff,
8                   SDI LABS, INC.

9

10                                                        Type text here

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "1"

Electronically Received 04/20/2022 03:23 PM

1  MICHAEL N. FEUER, Los Angeles City Attorney
2  ROBERT Y. CHA, Deputy Chief, SBN 182606
   CHRISTINA V. TUSAN, Supervising DCA, SBN 192203
3  WILLIAM R. PLETCHER, Deputy City Attorney, SBN 212664
   ALEX BERGJANS, Deputy City Attorney, SBN 302830
4  LOUISA KIRAKOSIAN, Deputy City Attorney, SBN 271983
   CARR TEKOSKY, Deputy City Attorney, SBN 293767
5  SARAH SPIELBERGER, Deputy City Attorney, SBN 311175
   OFFICE OF THE LOS ANGELES CITY ATTORNEY
6  CONSUMER PROTECTION UNIT
   200 North Main Street, 500 City Hall East
7  Los Angeles, California 90012-4131
   Telephone: (213) 978-8707 / Facsimile: (213) 978-8111
8  email: christina.tusan@lacity.org

9  GEORGE GASCÓN, Los Angeles County District Attorney
   HOON CHUN, Head Deputy District Attorney, SBN 132516
10 SEZA MIKIKIAN, Deputy District Attorney, SBN 245285
   LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
11 CONSUMER PROTECTION DIVISION
   211 W. Temple Street, 10th Floor
12 Los Angeles, CA 90012
   Telephone: (213) 257-2450 / Facsimile: (213) 633-0996
13 e-mail: hchun@da.lacounty.gov

14 Attorneys for Plaintiff, the
   PEOPLE OF THE STATE OF CALIFORNIA        **[NO FEE - Govt. Code § 6103]**

15           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16                    **COUNTY OF LOS ANGELES**

17

18  THE PEOPLE OF THE STATE OF          Case No. 22STCV13180
    CALIFORNIA,
19                                      **[~~PROPOSED~~] FINAL JUDGMENT AND**
                          Plaintiff,    **PERMANENT INJUNCTION**
20           v.
                                        Complaint Filed: April 20, 2022
21  SAMEDAY TECHNOLOGIES, INC., a       Trial Date: None Set
    Delaware corporation, D/B/A SAMEDAY Judge: Hon. Michelle Williams
22  HEALTH F/K/A/ PRAESIDIUM            Dept.: 74
    DIAGNOSTICS LLC, D/B/A SAMEDAY
23  HEALTH and SAMEDAY TESTING; FELIX
    HUETTENBACH, an individual; and DOES 1
24  through 10, inclusive,

25                          Defendants.

26

27

28

---

**FILED**
Superior Court of California
County of Los Angeles

**04/29/2022**

Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ C. Guerrero _____ Deputy

---

**STIPULATION FOR ENTRY OF FINAL JUDGMENT AND PERMANENT INJUNCTION**

1        Upon the submission of a Joint Stipulation for Final Judgment and Permanent Injunction

2   ("Stipulation") from Plaintiff, the People of the State of California (the "People"), and Defendants

3   Sameday Technologies Inc. f/k/a Praesidium Diagnostics, LLC ("Sameday") and Felix

4   Huettenbach ("Huettenbach") (collectively, "Settling Defendants", together with the People, the

5   "Parties"), which requests, in order to resolve the matter, entry of this [Proposed] Final Judgment

6   and Permanent Injunction ("Final Judgment") at the soonest possible date convenient for the

7   Court, and having considered the Joint Stipulation, the record in this matter, arguments of

8   counsel, if any, and good cause:

9        **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

10       **JURISDICTION AND STANDING**

11       1.     The Court has jurisdiction over Settling Defendants and the subject matter of this

12  action and over the Parties.

13       2.     Pursuant to Business and Professions Code sections 17203, 17204, 17206 and as

14  an enforcement of the People of the State of California's police and regulatory power, the City

15  Attorney and District Attorney have standing to bring the Enforcement Action on behalf of the

16  People to prosecute California's Unfair Competition Law and California's False Advertising Law.

17       3.     Pursuant to Insurance Code section 1871.1, the District Attorney has standing to

18  bring the Enforcement Action on behalf of the People to prosecute civil claims under Insurance

19  Code section 1871.1.

20       4.     The violations alleged in the Complaint occurred in California, including but not

21  limited to Los Angeles, California.

22       **DEFINITIONS**

23       5.     The Parties agree that the following definitions shall apply to the Final Judgment:

24       a.   "Business Record" has the same meaning and definition as the term "Business

25          Records" in California Evidence Code section 1271.

26       b.   "City" means the City of Los Angeles, both geographically and as a municipal

27          corporation.

28       c.   "City Attorney's Office" means the Los Angeles City Attorney's Office.

d. "County" means the County of Los Angeles, both geographically and as a county government of the State of California as defined and authorized under the California Constitution, California law, and the Charter of the County of Los Angeles.

e. "District Attorney's Office" means the Los Angeles County District Attorney's Office.

f. "CLIA" refers to the Centers for Medicare & Medicaid Services' Clinical and Laboratory Improvement Amendments, the regulations that govern all laboratory testing (except research) performed on human beings in the United States of America.

g. "COVID-19" means the novel coronavirus SARS-CoV-2 and the disease that it causes.

h. "COVID-19 Test" means and refers to any device, tool, or process used by Settling Defendants to identify, test for, or diagnose SARS-CoV-2 and/or COVID-19, including but not limited to polymerase chain reaction ("PCR"), antigen, or antibody tests.

i. "Existing Escrow Account" means and refers to the bank account established by Dr. Jeffrey Toll, Jeff Toll M.D., Inc. and/or Sameday Doctors PC at City National Bank with an account number ending in 297.

j. "Laboratory Report" means and refers to any record or document created or generated by a laboratory purportedly in accordance with CLIA regulations that records, memorializes, or reflects the result from any test conducted by said laboratory.

k. "Medical Record" means and refers to any record relating to the health history, diagnosis, or condition of an individual, or relating to treatment provided or proposed to be provided to the individual.

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

l.   "Settling Defendants" means Sameday Technologies, Inc., f/k/a Praesidium
Diagnostics LLC, d/b/a Sameday Health and Sameday Testing, and Felix
Huettenbach.

m.   "Enforcement Action" refers to this civil law enforcement action, entitled *People
v Sameday Technologies et. al.*

n.   "People" means the People of the State of California.  (Gov. Code, § 100.)

o.   "Turnaround Time" or "TAT" means the time interval from the time of initial
administration of a COVID-19 Test (and subsequent submission of the test to a
CLIA-approved and authorized laboratory for processing) until the delivery of a
genuine test result Laboratory Report to a consumer.

**INJUNCTIVE RELIEF**

6.      Pursuant to Business and Professions Code sections 17203, 17204, 17535, and the
Court's inherent equitable powers, Settling Defendants, and each of their agents, employees
acting within the scope of their employment, officers, representatives, successors, assigns,
partners and any person acting in concert or in participation with them, agree that, immediately
upon entry of the Final Judgment in this action (the "Effective Date"), they will be permanently
enjoined from:

a.   Violating Business and Professions Code section 17200 et seq. by:

i.   Engaging in unlawful business practices related to the false or misleading
advertisement or sale of any COVID-19 testing service, including but not
limited to making any untrue or misleading claims, which are known, or
which by the exercise of reasonable care should be known, to be untrue
or misleading; about the Turnaround Time for delivery of results from a
COVID-19 Test; the accuracy of any COVID-19 Test; and the
authenticity, provenance, accuracy, or reliability of any COVID-19 Test
result or Laboratory Report;

ii.   Engaging in unlawful business practices relating to the false or
misleading advertisement or sale of medical services or consultations,

---

3

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

including but not limited to making any untrue or misleading claims about insurance coverage; the charges to the consumer for any medical service or consultation to a consumer or their insurer; improperly encouraging or requiring consumers to seek unnecessary medical services in order to have the costs of certain services covered by their insurers, which are known, or which by the exercise of reasonable care should be known, to be untrue or misleading;

iii. Engaging in unlawful business practices, in violation of Penal Code sections 470 or 471.5, by fraudulently, unlawfully or improperly creating, altering, or falsifying any Business Record, Medical Record, COVID-19 Test result, or Laboratory Report, provided, however, for the avoidance of doubt, nothing in this section shall restrict any proper modification or correction that is authorized by law;

iv. Engaging in unlawful business practices, in violation of Penal Code section 502, by fraudulently, unlawfully or without any required authorization using any data in order to engage in or execute any scheme or artifice to defraud, deceive, or extort or wrongfully control or improperly obtain money including but not limited to altering, with the intent to defraud, any data, digital record, digital Business Record, digital Medical Record, digital COVID-19 Test result, or digital Laboratory Report;

v. Engaging in unlawful business practices, in violation of Penal Code section 530.5 subd.(a), by fraudulently, willfully and without required authorization misusing personal identifying information, as defined in Penal Code section 530.55, for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person;

4

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

vi.   Engaging in unlawful business practices, in violation of Penal Code section 530.5 subd.(c)(1), by acquiring or retaining possession of personal identifying information, without authorization and with intent to defraud, as defined in Penal Code section 530.55; provided, however, for the avoidance of doubt, nothing in the section shall restrict the retention of personal identifying information that is permitted by law;

vii.   Engaging in unlawful business practices in violation of Penal Code section 550 subd. (a)(6), by knowingly making or causing to be made any knowingly false or fraudulent claim for payment of a health care benefit, including but not limited to knowingly making or causing the submission of false or fraudulent claims to medical insurers;

viii.   Engaging in unlawful business practices in violation of Penal Code section 550 subd. (b)(1), by presenting or causing to be presented a statement as part of, or in support of, a claim for payment of a health care benefit while knowing that the statement contains any false or misleading information concerning any material fact; including but not limited to knowingly presenting or causing to be presented false or misleading statements about material facts in claims to medical insurers;

ix.   Engaging in unlawful business practices, in violation of Insurance Code section 1871.7(a), by employing runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services of health insurance benefits; provided, however, for the avoidance of doubt, nothing in this section shall restrict the employment or compensation of sales staff consistent with fair market value in any manner that is not prohibited by law;

x.   Engaging in unlawful business practices, in violation of Business and Professions Code section 650 subd.(a), by accepting any unlawful compensation or inducement for referring patients, clients, or customers

5

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

to any person; provided, however, for the avoidance of doubt, nothing in this section shall restrict compensation to an employee consistent with fair market value in any manner that is not prohibited by law or that is otherwise permitted under Business and Professions Code section 650 subd.(b) or other similar laws;

xi. Engaging in unlawful business practices, in violation of Penal Code section 550 subd. (b)(3), by knowingly failing to disclose: a) the occurrence of an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled, including but not limited to failing to disclose any unlawful employment or use of any runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services of health insurance benefits, b) the offering of any compensation or inducement for referring patients, clients, or customers to any person, c) the fact that claims are false or fraudulent, or d) the fact that claims contain false or misleading statements concerning material facts; provided, however, for the avoidance of doubt, nothing in this section shall require disclosure regarding the employment or compensation of sales staff consistent with fair market value in any manner that is not prohibited by law or in regards to any arrangements that are otherwise permitted under Business and Professions Code section 650 subd.(b) or other similar laws; and

xii. Engaging in fraudulent business practices, as defined by Business and Professions Code section 17200, by deceiving consumers by making untrue or misleading statements, about the speed in which the results from a COVID-19 Test may be processed and reported,  the accuracy of any COVID-19 Test, and the authenticity, provenance, accuracy, or reliability of any COVID-19 Test result or Laboratory Report; deceiving

insurers by submitting fraudulent, as defined by Business and Professions Code section 17200, claims for reimbursement for medically unnecessary telemedicine consults, claims that fraudulently, as defined by Business and Professions Code section 17200, up-code the time and complexity of the medical visits, claims that fraudulently, as defined by Business and Professions Code section 17200, represent that customers had COVID-19 symptoms or were exposed to COVID-19 when they did not or were not, and claims that fraudulently, as defined by Business and Professions Code section 17200, seek reimbursement for medical services that were not rendered;

b. Violating Business and Professions Code section 17500 et seq. by making or disseminating, or causing to be made or disseminated, any untrue or misleading statements, which are known, or which by the exercise of reasonable care should be known, to be untrue or misleading, about:

    i. medical services or medical testing services, including COVID-19 testing services,

    ii. insurance coverage;

    iii. the billed charges of any medical service or consultation to a consumer or their insurer;

    iv. improperly encouraging or requiring consumers to seek unnecessary medical services in order to have the costs of certain services covered by their insurers, including but not limited to representing to consumers seeking to pay for a COVID-19 Test through their insurers:

        (i) that a medical consultation was required in order to obtain a COVID-19 Test;

    v. the Turnaround Time in which the results from a COVID-19 Test may be processed and reported, including but not limited to representing that:

(i)    Consumers will receive COVID-19 Test results within a certain time frame if Defendants have no reliable factual basis, contractual, scientific, logistical, or practical control or guarantee that test results will be delivered by the processing lab within that time frame;

(ii)    Consumers can receive "Same Day Test, Next Day Results," if Defendants have no reliable factual basis, contractual, scientific, logistical, or practical control or guarantee that the COVID-19 Test results will be reasonably delivered within that time frame;

(iii)    Consumers can receive "Rapid PCR Testing. 24 Hour Results," when Defendants have no reliable factual basis, contractual, scientific, logistical, or practical control or guarantee that test results will be reasonably delivered within that time frame;

(iv)    Consumers can receive "Next Day Results," when Defendants have no reliable factual basis, contractual, scientific, logistical, or practical control or guarantee that test results will be reasonably delivered within that time frame;

(v)    Consumers can "Get Results the Next Morning," when Defendants have no reliable factual basis, contractual, scientific, logistical, or practical control or guarantee that test results will be reasonably delivered within that time frame;

(vi)    Consumers can "Get your results in 24 hours or less!", when Defendants have no reliable factual basis, contractual, scientific, logistical, or practical control or guarantee that test results will be reasonably delivered within that time frame;

vi.   the accuracy of any COVID-19 Test; and

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

vii.  the authenticity, provenance, accuracy, or reliability of any COVID-19

Test result or Laboratory Report.

c.  Violating any federal, California, Los Angeles County, or Los Angeles City law,

ordinance, or regulation.

7.      Pursuant to Business and Professions Code sections 17203, 17204, 17535, and the

Court's inherent equitable powers, Settling Defendants, and each of their agents, officers,

employees acting within the scope of their employment representatives, partners and any person

acting in concert or in participation with them, agree that, immediately upon the Effective Date,

Defendant Felix Huettenbach will be permanently enjoined from:

a.  Having database/login credentials that would allow for direct access to any

Medical Record, including but not limited to test results and Laboratory

Reports, belonging to or associated with any of Sameday's customers or any

entity or individual seeking services from Sameday;

b.  Altering, editing, or modifying any Medical Record, including but not limited

to test results and Laboratory Reports, belonging to or associated with any of

Sameday's customers or any entity or individual seeking services from

Sameday; and

c.  Knowingly directing or causing the improper or unlawful alteration, edit, or

modification of any Medical Record, including but not limited to test results

and Laboratory Reports, belonging to or associated with any of Sameday's

customers or any entity or individual seeking services from Sameday.

**MONITORING**

8.      Pursuant to the Final Judgment, Settling Defendants agree and each of their agents,

employees, officers, representatives, partners and any person acting in concert or in participation

with them, agree, within twenty-one (21) days from the Effective Date, to retain for a term of six

(6) months a monitor to inspect, observe, and report on Settling Defendants' compliance with

paragraphs 6(a)(iii)-(vi) and 7 of the Final Judgment ("Monitor").  The Monitor shall be approved

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

1    by the People prior to his or her appointment.  The Monitor shall expressly acknowledge that it

2    owes a fiduciary duty of trust, candor, and honesty to the People.

3        9.      The Monitor cannot be removed without the express, written consent of the

4    People.

5        10.     Settling Defendants agree to disclose to and grant the Monitor full access to

6    Settling Defendants' books, financial records, billing records, Laboratory Reports,

7    communications with customers and vendors, and all other records the Monitor reasonably

8    determines are necessary to evaluate Settling Defendants' compliance with paragraphs 6(a)(iii)-

9    (vi) and 7 of the Final Judgment.

10       11.     At three (3) months and six (6) months from his or her appointment, the Monitor

11   shall prepare and submit to the People a written report ("Report") regarding Settling Defendants'

12   compliance with the Permanent Injunction.  The Monitor shall share a copy of the Report with

13   Settling Defendants and Settling Defendants shall have the opportunity to submit a written

14   response to the People within fourteen (14) days of the Report's publication.

15       12.     In the event that the Monitor makes a finding that Settling Defendants have

16   violated any provision of the Permanent Injunction, the Monitor shall provide written notice of

17   said finding to Settling Defendants.  Settling Defendants shall have two (2) business days to cure

18   the violation.  The Monitor shall report the violation to the People in the event that (A) Settling

19   Defendants fail to timely cure the violation or (B) the Monitor determines in his or her reasoned

20   judgment that the violation is not curable.

21       13.     Settling Defendants shall bear all of the Monitor's costs and fees, which shall not

22   exceed one hundred thousand dollars ($100,000).

23                                    **RESTITUTION**

24       14.     Pursuant to the Final Judgment and Business and Professions Code sections 17203

25   and 17535, Settling Defendants agree that they are jointly and severally liable to pay restitution in

26   the total amount of nine million, six hundred twenty-eight thousand, three hundred thirteen dollars

27   ($9,628,313) as follows:

28

a.  Within thirty (30) days of the Effective Date, Settling Defendants shall issue refunds totaling five million, eighty-eight thousand nine hundred and twenty-five dollars ($5,088,925) to (1) all California consumers who paid cash and received a COVID-19 PCR Test from Settling Defendants between October 1, 2020 and December 31, 2020, as well as certain consumers who received a COVID-19 PCR Test from Settling Defendants, identified by the People to Settling Defendants prior to the Effective Date, outside of that time frame; and (2) California consumers who did not receive COVID-19 Test results within the TAT advertised to such consumers despite paying for said service from Settling Defendants, and have not already been refunded.  In the event Settling Defendants are unable to locate the consumers described in this subparagraph or for any other reason fail to make the specified refund (including if consumers do not cash or redeem their refund) within six (6) months of the Effective Date, the total amount of refunds that Settling Defendants fail to make shall instead be paid by Settling Defendants to the Consumer Protection Prosecution Trust Fund within seven (7) months of the Effective Date.

b.  Within forty-five (45) days of the Effective Date, Settling Defendants shall create an escrow fund to encompass all monies Settling Defendants collected that were paid by insurers as reimbursement for California-based medical consultation claims submitted or caused to be submitted by Settling Defendants. Defendants shall deposit a total amount of four million, five hundred thirty-nine thousand, three hundred eighty-eight ($4,539,388) with one million dollars ($1,000,000) deposited upon the creation of the escrow fund and the remaining three million, five hundred thirty-nine thousand, three hundred eighty-eight dollars ($3,539,388) deposited within one (1) year of the entry of the Final Judgment and Permanent Injunction.  Upon receipt of those funds, Jeffrey Toll, M.D. shall utilize the escrowed funds to refund all such

1   insurers who paid for the consultation services alleged in the Complaint who

2   have not already been refunded for said services.

3   15.   Settling Defendants hereby waive and release any and all rights or entitlement to

4   any funds deposited in the Existing Escrow Account.  Settling Defendants further agree that

5   Jeffrey Toll, M.D. shall be permitted to disburse any and all funds deposited in the Existing

6   Escrow Account to refund all such insurers who paid for the consultation services alleged in the

7   Complaint who have not already been refunded for said services.

8   **CIVIL PENALTIES**

9   16.   Pursuant to the Final Judgment and Business and Professions Code sections 17206

10   and 17536, Settling Defendants agree that they are jointly and severally liable to pay civil

11   penalties in the total amount of twelve million, seven hundred seventy-one thousand, six hundred

12   eighty-eight dollars ($12,771,688).  Pursuant to California Business and Professions Code

13   sections 17206(f) and 17536, the entire amount of the penalty collected shall be payable to the

14   City of Los Angeles and the County of Los Angeles, for the exclusive use by the City Attorney

15   and Los Angeles County for the enforcement of consumer protection laws. The civil penalties

16   shall be paid in two installments with the first installment payable upon entry of judgment and the

17   second payment due within one year of the date of entry of judgment.

18   17.   Immediately upon entry of the Final Judgment and Permanent Injunction, Settling

19   Defendants shall deliver two equal and separate payments totaling five million, sixty-one

20   thousand and seventy-four dollars ($5,061,074) in the sums of (i) two million, five hundred thirty

21   thousand, five hundred and thirty-seven dollars ($2,530,537), payable to "City of Los Angeles";

22   and (ii) two million, five hundred thirty thousand, five hundred and thirty-seven dollars

23   ($2,530,537), payable to the "Los Angeles County District Attorney's Office."  Within one year

24   of the date of entry of judgment, Settling Defendants shall deliver two equal and separate

25   payments totaling seven million, seven hundred ten thousand, six hundred fourteen dollars

26   ($7,710,613) in the sums of (i) three million, eight hundred fifty-five thousand, three hundred and

27   six dollars and fifty cents ($3,855,306.50) payable to the "City of Los Angeles"; and (ii) three

28   million, eight hundred fifty-five thousand, three hundred and seven dollars and fifty cents

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

($3,855,306.50), payable to the "Los Angeles County District Attorney's Office."   Settling Defendants shall deliver the payments in cashier's checks, wire transfers, or other certified funds delivered by overnight mail or courier to: Christina Tusan, Supervising Deputy City Attorney, Office of the Los Angeles City Attorney, Criminal and Special Litigation Branch, 200 N. Main Street, 500 City Hall East, Los Angeles, California 90012-4131 and Hoon Chun, Head Deputy, Consumer Protection Division, Los Angeles County District Attorney's Office, 211 W. Temple Street, 10th Floor, Los Angeles, California 90012, respectively.

**DEFENDANTS' COSTS**

18.    Defendants shall bear their own attorneys' fees, costs, and any other expenses related to this Enforcement Action.

**RETENTION OF JURISDICTION AND ENFORCEMENT**

19.    Pursuant to California Code of Civil Procedure section 664.6 and the Court's inherent authority, the Court shall retain jurisdiction over this Enforcement Action to entertain such further proceedings and enter such further orders as may be necessary or appropriate to enforce the Final Judgment. The People shall retain exclusive jurisdiction to enforce the terms of the Final Judgment, including, the ability to obtain its attorneys' fees, costs, and penalties.

20.    Pursuant to Business and Professions Code section 17207, any person who intentionally violates the injunction set forth in the Final Judgment shall be liable for a civil penalty not to exceed six thousand dollars ($6,000) for each violation. Where the conduct constituting a violation is of a continuing nature, each day of that conduct is a separate and distinct violation. In determining the amount of the civil penalty, the court shall consider all relevant circumstances, including, but not limited to, the extent of the harm caused by the conduct constituting a violation, the nature and persistence of that conduct, the length of time over which the conduct occurred, the assets, liabilities, and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant.

21.    Settling Defendants shall be liable for reasonable attorneys' fees and costs incurred, including investigative costs, by the People for the enforcement of any violation of the

1  Final Judgment, including but not limited to the collection of any delinquent payment owed

2  pursuant to paragraphs 14-17 of the Final Judgment.

3  **GENERAL PROVISIONS**

4      22.    The Final Judgment is governed by the law of the State of California.

5      23.    Settling Defendants shall notify their agents and contractors responsible for

6  carrying out and effecting the terms of the Final Judgment of the obligations, duties and

7  responsibilities imposed on Settling Defendants by the Final Judgment.

8      24.    Nothing in the Final Judgment shall be construed as relieving Settling Defendants

9  of their obligations to comply with local, state and federal laws, regulations, or rules, or granting

10  Settling Defendants permission to engage in any acts or practices prohibited by such laws,

11  regulations or rules.

12      25.    For purposes of construing the Final Judgment, the Final Judgment shall be

13  deemed to have been drafted by all Parties and shall not, therefore, be construed against any Party

14  for that reason in any dispute.

15      26.    Any failure by any Party to the Final Judgment to insist upon the strict

16  performance by any other Party of any provision of this Judgment shall not be deemed a waiver of

17  any provision the Final Judgment and such Party, notwithstanding such failure, shall have the

18  right thereafter to insist upon the specific performance of any and all provisions of the Final

19  Judgment.

20      27.    The Final Judgment constitutes the complete judgment between the Parties. The

21  Final Judgment may not be amended except by consent of the Parties.

22      28.    The clerk shall enter the Final Judgment forthwith.

23

24  Dated: _____ April 29 , 2022

25

26

27  _____
    HON. JUDGE OF THE SUPERIOR COURT

28      Hon. Michelle Williams Court

---

14

**[PROPOSED] FINAL JUDGMENT AND PERMANENT INJUNCTION**

EXHIBIT "2"

**SDI⬡LABS**

**Specialty Diagnostics, Inc.**
12634 Hoover Street,
Garden Grove, CA 92841

## MUTUAL CONFIDENTIALITY AND
## NON-DISCLOSURE AGREEMENT

THIS MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT (this "Agreement"), dated and effective as of 08-22-22, is made and entered into by and between SPECIALTY DIAGNOSTICS (SDI Labs, INC) at 12634 Hoover Street, Garden Grove, CA 92841 (the "Company") and Sameday Health/Sameday Technologies ("Recipient").

WHEREAS, Recipient and the Company wish to explore a possible business relationship (the "Business Purpose") in connection with which each party may disclose certain of its confidential and proprietary information to the other party (such party when disclosing such information being a "Disclosing Party" and such party when receiving such information being a "Receiving Party"); and

WHEREAS, the parties wish to provide for the protection of their respective Confidential Information (as defined in Section 1 below):

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    Definition of Confidential Information. As used herein, "Confidential Information" means any and all non-public, confidential and/or proprietary information and all intellectual property rights therein (including, without limitation all rights under patent, copyright and trade secret laws) disclosed by the Disclosing Party or any of its Representatives (as defined below) to the Receiving Party or its Representatives. Without limiting the generality of the foregoing, Confidential Information may include, but is not limited to, information that relates to or concerns a party's patents, patent applications, trade secrets, research, experimental work, product plans, products, developments, know-how, inventions, processes, design details, engineering, software (including source and object code), algorithms, customers, financial information and projections, business forecasts, sales and marketing plans and third party reports and analysis (including any documents or memoranda that include part or all of this information). The existence of any business negotiations, discussions, consultations, or agreements in progress between the parties shall be considered Confidential Information. Any Confidential Information disclosed in a written or other tangible form shall be clearly marked as "confidential," "proprietary" or words of similar import, and any Confidential Information disclosed orally shall be identified as confidential at the time of its disclosure and the Disclosing Party shall make reasonable efforts to reduce such Confidential Information to writing and to provide it to the Receiving Party within twenty (20) days of its disclosure. As used in this Agreement the term "Representative" means, as to each party, such party's affiliates and its or their directors, officers, employees, agents and advisors (including, without limitation, financial advisors, legal counsel and accountants).

1

*O.M.*
Initials:_____/_____

**SDI⚗LABS**

**Specialty Diagnostics, Inc.**
12634 Hoover Street,
Garden Grove, CA 92841

2.    <u>Obligations of the Parties</u>. Unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (i) to keep all Confidential Information in the strictest of confidence and not to disclose or reveal any Confidential Information to any person (other than such Representatives of the Receiving Party who are actively and directly involved in the discussions or the evaluation of the Business Purpose and who have a need to know such Confidential Information for the purpose of evaluating the Business Purpose and who have agreed to keep such Confidential Information confidential in accordance with the terms and provisions of this Agreement); (ii) not to use the Confidential Information for any purpose other than in connection with the Business Purpose including, but not limited to, reverse engineering, de-compiling, disassembling, altering, duplicating, modifying or creating derivative works therefrom; and (iii) not to disclose to any person (other than such Representatives of the Receiving Party who are actively and directly involved in the discussions or evaluation of the Business Purpose and who have a need to know for the purpose of evaluating the Business Purpose and who are have agreed to maintain in confidence the information disclosed hereunder in accordance with the terms and provisions of this Agreement), the fact that discussions are taking place with respect to the Business Purpose (including the status and terms of such discussions) or the fact that Confidential Information has been or may be made available to the Receiving Party and/or its Representatives. The Receiving Party shall treat all Confidential Information with the same degree of care, but no less than a reasonable degree of care, as it accords its own Confidential Information. The parties agree to cause their Representatives who receive Confidential Information to observe the requirements applicable to the Receiving Party pursuant to this Agreement with respect to such information, including, but not limited to, the restrictions on use and disclosure of such information set forth in this Section 2.

3.    <u>Compliance with Insider Trading and Public Disclosure Law</u>. Each party acknowledges that it may become aware of material, non-public information concerning the other party in the course of the discussions and negotiations contemplated herein. Accordingly, each party agrees not to: (i) effect or seek, offer or propose (whether publicly or otherwise) to effect, or cause or participate in or in any way assist any other person to effect or seek, offer or propose (whether publicly or otherwise) to effect or participate in any trading of any securities (or beneficial ownership thereof) of the other party; (ii) disclose or "tip" material non-public information concerning the other party to any person or entity; (iii) give trading advice of any kind to any person or entity concerning the other party; or (iv) except with the prior written consent of the other party, take any action that might force the other party to make a public announcement under applicable securities laws.

4.    <u>Exceptions</u>. The obligations of the parties set forth herein shall not apply to any information that: (i) is in the public domain at or after the time it was disclosed by the Disclosing Party to the Receiving Party through no fault of the Receiving Party; (ii) was rightfully in the Receiving Party's possession free of any obligation of confidentiality at or after the time it was communicated to by the Disclosing Party; (iii) is disclosed with the prior written approval of the Disclosing Party; (iv) is independently developed by the Receiving Party without reference to or use of the Confidential Information; (v) is or becomes available to the Receiving Party from a

*O.M.*

2                    Initials:_____/_____

**SDI☓LABS**
**Specialty Diagnostics, Inc.**
12634 Hoover Street,
Garden Grove, CA 92841

person other than the Disclosing Party or any of its Representatives who is not bound by an obligation to maintain the confidentiality of such information; (vi) is necessary to disclose to establish the rights of either party under this Agreement; or (vii) is required to be disclosed pursuant to an order or requirement of a court, administrative agency or governmental body, provided that the Receiving Party shall promptly notify the Disclosing Party of the facts thereof to enable the Disclosing Party to seek a protective order or otherwise prevent or restrict disclosure of such information, and upon request of the Disclosing Party, shall reasonably cooperate with the Disclosing Party (at the Disclosing Party's sole cost and expense) to obtain such protective order or other appropriate remedy.  In the event that no such protective order or other remedy is obtained, or the Disclosing Party waives compliance (in whole or in part) with the terms and conditions of this Agreement, the Receiving Party shall disclose only that portion of the Confidential Information that is required to be disclosed and shall use all reasonable efforts to ensure that all Confidential Information that is disclosed shall be accorded confidential treatment.

5.    Return or Destruction of Materials. Any materials or documents, and all copies thereof, which have been furnished to the Receiving Party and its Representatives by the Disclosing Party shall, at the option of the Disclosing Party, be promptly returned to the Disclosing Party or destroyed within ten (10) days after receipt by the Receiving Party of a written notice by Disclosing Party requesting such return or destruction. Upon such request, all analyses, compilations, studies or other documents containing or reflecting the Receiving Party's or its Representatives use of the Confidential Information will be destroyed by the Receiving Party, and such destruction confirmed to the Disclosing Party in writing.

6.    Relationship of the Parties. As between the parties, all Confidential Information disclosed to, delivered to, or accessed by a Receiving Party from a Disclosing Party hereunder shall be and remain the sole and exclusive property of the Disclosing Party and nothing contained herein shall be construed as granting to or conferring upon any Receiving Party any rights, by license or otherwise, in any Confidential Information or any intellectual property rights embodied therein (including, without limitation, any patent, copyright or trade secret) of the Disclosing Party. Each party hereto agrees that until a definitive agreement regarding the Business Purpose has been executed by the parties, no party is under any legal obligation and shall have no liability to any other party of any nature whatsoever with respect to the Business Purpose by virtue of this Agreement (other than with respect to the confidentiality and other matters expressly set forth herein). Nothing in this Agreement shall be deemed to create any agency, partnership or joint venture between the parties.

7.    No Solicitation. Neither party shall directly or indirectly solicit any of the other party's employees or contractors involved in the discussions relating to the Business Purpose during such discussions and for a period of two (2) years thereafter, without the express written approval of the other party.

8.    Continuing Obligation. Whether or not the Business Purposes is consummated, the terms and obligations pertaining to confidentiality in this Agreement shall nevertheless remain in

*O.M.*

3            Initials:_____/_____

**SDI☓LABS**

**Specialty Diagnostics, Inc.**
12634 Hoover Street,
Garden Grove, CA 92841

full force and effect for a period of two (2) years from the last disclosure of Confidential Information from one party to the other hereunder, unless the Disclosing Party expressly agrees in writing to release all or part of its Confidential Information from the restrictions imposed by this Agreement before such period has elapsed.

9.    Injunctive Relief. Each party acknowledges and agrees that the Confidential Information is of a special and unique character which gives it a peculiar value, and that any breach by the Receiving Party of its obligations under this Agreement cannot be adequately compensated by damages in an action at law and may cause the Disclosing Party irreparable harm and injury. Accordingly, the Disclosing Party shall be entitled to the remedies of injunction, specific performance and other equitable relief to redress any breach or threatened breach of the Receiving Party's or its Representatives obligations under this Agreement and neither proof of special damages nor any bond or security shall be necessary to seek such relief. Nothing contained in this Section 9 shall, however, be construed as a waiver by either party of any other rights or remedies available to such party, including, without limitation, rights to damages.

10.    No Warranty. Each party agrees that it is not entitled to rely on the accuracy or completeness of the Confidential Information. Accordingly, each party acknowledges that neither party nor any of their respective Representatives makes any express or implied representation or warranty as to the accuracy, completeness, fitness for a particular purpose, title or non-infringement of any Confidential Information and each party agrees that none of such persons shall have any liability to it or any of its Representatives (i) for any errors therein or omissions therefrom or (ii) relating to or arising from use of any Confidential Information by such party or any of its Representatives.

11.    Waiver. No failure or delay by a party hereto in exercising any right, power or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise thereof preclude any other further exercise thereof or the exercise of any right, power or privilege hereunder. The waiver of any breach or default hereunder shall not constitute the waiver of any subsequent breach or default.

12.    Governing Law. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of California applicable to agreements executed and to be performed entirely in such state.

13.    Successors and Assigns. This Agreement, and any and all of rights and obligations hereunder, may not be assigned or otherwise transferred (whether by contract, acquisition, reorganization, bankruptcy, merger, operation of law or otherwise), in whole or in part, by either party without the prior written consent of the other party. Subject to the immediately preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

14.    Entire Agreement. This Agreement constitutes the complete and entire understanding and agreement, and supersedes all prior and contemporaneous understandings and agreements (whether written or oral), between the parties with respect to the subject matter hereof

*O.M.*

4                                                Initials:_____/_____

**SDIⵣLABS**

**Specialty Diagnostics, Inc.**
12634 Hoover Street,
Garden Grove, CA 92841

and may not be modified or amended except by written instrument duly executed by each of the parties.

15. <u>Severability</u>. In the case any provision in this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be invalid, illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

16. <u>Amendments</u>. No alteration, amendment or modification of the terms of this Agreement shall be valid or effective unless in writing and signed by both parties.

17. <u>Headings</u>. The section headings of this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.

18. <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by facsimile, electronic mail or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature hereunder delivered by facsimile or electronic transmission, such as e-mail or PDF, shall be deemed for all purposes as constituting good and valid execution and delivery of this Agreement by such party.

*[Signature Page to Follow]*

Initials:_____/_____

Document Ref: CQ3CL-IVZTA-TWQNF-VEKGJ



**SDILABS**
**Specialty Diagnostics, Inc.**
12634 Hoover Street,
Garden Grove, CA 92841

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date set forth above.

**SPECIALTY DIAGNOSTICS SDI Labs, INC**

By:_____

Name: OZMAN MOHIUDDIN

Title:   PRESIDENT & CEO

**Sameday Health**

By:_____

Name: Jeff Nelson

Title:   Head of Business Development

# Signature Certificate

Reference number  CQ3CL-IVZTA-TWQNF-VEKGJ

| Signer | Timestamp | Signature |
|---|---|---|
| **Ozman Mohiuddin**<br>Email: ozman@sdilabsinc.com | | |
| Sent:<br>Signed: | 23 Aug 2022 01:41:00 UTC<br>23 Aug 2022 01:41:00 UTC | *Ozman Mohiuddin*<br><br>IP address: 108.80.17.162<br>Location: Anaheim, United States |
| **Jeff Nelson**<br>Email: jeffnelson@sameday-testing.com | | |
| Sent:<br>Viewed:<br>Signed: | 23 Aug 2022 01:41:00 UTC<br>29 Aug 2022 17:48:17 UTC<br>29 Aug 2022 17:49:03 UTC | *Jeff Nelson* |
| **Recipient Verification:**<br>✓Email verified | 29 Aug 2022 17:48:17 UTC | IP address: 73.181.103.29<br>Location: Boulder, United States |

Document completed by all parties on:
29 Aug 2022 17:49:03 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 30,000+ companies worldwide.



EXHIBIT "3"

DocuSign Envelope ID: CD3FC699-568A-4A7C-9AF0-9FDD393BCF17

# ESCROW AGREEMENT AND INSTRUCTIONS

Escrow Name:  SDI Labs/Fundamentum Health
Date: January 9, 2023
To: Wicker Law Group

Before close of escrow Fundamentum Health, Inc., a Delaware corporation, or their agents (BUYER) have deposited or
will deposit with Wicker Law Group under these instructions the following:

> Aggregate funds of Three Million Five-Hundred and Four Thousand ($3,504,000.00) Dollars
> pursuant to the parties TERM SHEET FOR THE POTENTIAL ACQUISITION OF SDI LABS, INC.
> dated November 30, 2022 and a Stock Purchase Agreement to be provided and any amendments
> thereto between Fundamentum Health (BUYER) and SDI Labs, Inc. (SELLER).

At this time BUYER has deposited Three Million ($3,000,000.00) Dollars into escrow. The parties hereto have previously
authorized all funds to be held without interest in the trust account of S. Edward Wicker at Wells Fargo Bank. All parties
now agree to these Escrow Instructions dated January 9, 2023 to this transaction and hereby authorize a distribution as
follows:

> (a) The sum of Two Million Seven Hundred Eighty-Six ($2,786,000.00) Dollars payable to the Seller
>     (SDI Labs, Inc.); and
> (b) The sum of Two Hundred Ten Thousand ($210,000.00) Dollars payable to the Broker, Manhattan
>     Biz as instructed by Sasa Milosevic; and
> (c) The sum of Eight Thousand ($8,000.00) Dollars payable to S. Edward Wicker for Escrow
>     Services. A payment of Four Thousand ($4,000) of this escrow fee shall be deducted from the
>     funds payable to Seller for this transaction. The remaining balance of Four Thousand ($4,000)
>     Dollars shall be paid forthwith from funds to be deposited by Buyer; and
> (d) The remaining Five Hundred Thousand ($500,000.00) Dollars is expected to be disbursed to the
>     Seller in two equal payments at six and twelve months from the date of these Escrow Instructions.
>     This will be subject to future written agreement of the parties.
> (e) Any additional monies payable under the parties future Stock Purchase Agreement and any
>     amendments thereto are to be paid according to the terms of that agreement outside of this
>     escrow. Distributions herein may be made via cash, check, wire transfer or as the parties elect.

All parties have been requested by escrow holder to seek legal counsel of their own choosing at their own expense. All
parties have been afforded adequate time and opportunity to read and understand these escrow instructions and all other
documents referred to herein. These escrow closing instructions constitute the entire agreement between the escrow holder
and the undersigned parties. Any amendments and/or supplements to these instructions must be made in writing. We
further understand and agree that Wicker Law Group assumes no liability as to any law, ordinance or governmental
regulations. Wicker Law Group is acting as escrow agent only and not as legal counsel for any party herein.

> (a) These escrow closing instructions may be executed in counterparts with like effect as if all signatures
>     appeared on a single copy.
> (b) You are bound solely by the provisions set forth in these escrow instructions. You are to be concerned only in
>     the performance of your duties in compliance with these escrow closing instructions. You are to assume no
>     liability for the sufficiency or enforceability of any provisions in the parties Stock Purchase Agreement. The
>     undersigned hereby affirm that all of the terms and conditions contained in said Stock Purchase Agreement
>     have been met or waived to the complete satisfaction of the parties.
> (c) Should any disputes arise between parties interested in property or funds covered by these instructions, you
>     shall have the option to hold all matters pending in their existing status or to join in or commence a court
>     action, or to bring an action in interpleader, at your option. Upon your determination to hold this escrow open
>     for determination of the rights of the parties, you will be relieved of all responsibility to proceed until the
>     rights of parties are settled to your satisfaction. Further, you as escrow holder, shall be entitled to continue to

ESCROW INSTRUCTIONS                                                        PAGE 1 OF 2
Initials: FH                  Initials: OM                Initials: JM

DocuSign Envelope ID: CD3FC699-568A-4A7C-9AF0-9FDD393BCF17

so refrain to act until (a) the parties hereto have reached an agreement in their differences and shall have notified the escrow holder in writing of such agreement or (b) the rights of the parties have been duly adjudicated by a Court of competent jurisdiction. It is further agreed that in the event of any suit or claim made against you by either or both parties to this escrow or in the even any suit is instituted by you to resolve your responsibility regarding conflicting claims of both parties to this escrow, that said parties, jointly and severally, shall be required to pay you all expenses, costs and reasonable attorney's fees incurred by you in connection therewith, whether suit is instituted by you or any of the parties hereto, or not.

(d) In the event of any disagreement between the parties hereto or demands or claims made upon you by the parties hereto or interested herein or by any other party, you, as escrow holder, shall have the right to employ legal counsel to advise and/or represent you in any Suit or action brought affecting this escrow or the papers held in connection herewith or to bring an action in interpleader, at your option. The parties hereto shall be jointly and severally liable to you for any and all attorney's fees, costs, disbursements incurred by you in connection with the employment of counsel in such conflict and, upon demand, the parties shall forthwith pay the same to you, as escrow holder. If you are required to institute suit to collect such sums as are owed to you pursuant to this or any other provision of these instructions, you shall further be entitled to payment by the parties found liable for such unpaid charges of any costs and attorney's fees incurred in the prosecution of such action.

(e) If for any reason funds are retained or remain in escrow after closing date, which is January 9, 2024, you are to deduct therefrom a reasonable monthly charge as custodian thereof of not less than $25.00 per month.


IN WITNESS WHEREOF, this party has signed as of the date first written above.

*Felix Huettenbach*

FUNDAMENTUM HEALTH, Inc.
By: Felix Huettenbach, CEO
Buyer


IN WITNESS WHEREOF, this party has signed as of the date first written above.

*Ozman Mohiuddin*

SDI LABS, Inc.
By: Ozman Mohiuddin, CEO
Seller


IN WITNESS WHEREOF, this party has signed as of the date first written above.

*Sasa Milosevic*

Manhattan Biz
By: Sasa Milosevic, CEO
Broker


ESCROW INSTRUCTIONS

Initials: FH          Initials: OM          Initials: SM          PAGE 2 OF 2

EXHIBIT "4"



**TIEDT & HURD**
Attorneys at Law

1250 Corona Pointe Court, Suite 402
Corona, CA 92879
Tel: (951) 549-9400 ♦ Fax: (951) 549-9800

May 1, 2023

**VIA REGULAR AND EMAIL**
Nioura F. Ghazni
Danielle Vrabie
Sheppard Mullin
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Email: nghazni@sheppardmullin.com DVrabie@sheppardmullin.com

    Re:    SDI Labs, Inc.

Gentlepersons:

    I received your e-mail complaining that you did not receive a letter promised by me last Wednesday. The transaction is in dispute. Fundamentum Health, Inc ("Fundamentum")/Same Day Technologies, Inc.'s (Same Day") CEO Felix Huettenbach ("Huettenbach") suddenly disappears while Sheppard Mullin unilaterally makes a non-negotiable offer on behalf of a new and unknown CEO of Fundamentum. This simply did not make sense since Huettenbach claimed he owned Fundamentum and Same Day. The offer of $ 2M million was clearly a non-starter.

    Finally, Huettenbach emailed my client and advised Mr. Mohiuddin to work with Sheppard Mullin. Since the transaction is in dispute, I have now had the opportunity to meet with Mr. Mohiuddin and discuss our next steps after his communication with Huettenbach.

    I realize you want the funds in escrow to be immediately released. Making a threatening non-negotiable demand is not the way you should resolve this dispute. In light of what we are learning right now and what has transpired, we cannot accept this demand. As a condition precedent to discussing the resolution of this matter, we require the return of ALL of SDI Lab, Inc.'s ("SDI") confidential, proprietary and trade secret information ("Confidential Information").

    On **August 23, 2022**, a mutual confidentiality and non-disclosure agreement ("NDA") was signed by Same Day Technologies, Inc. and SDI Labs, Inc. Same Day agreed to keep all Confidential Information in the strictest of confidence and not to disclose or reveal any Confidential Information to any person (other than such Representatives of the Receiving Party who are actively and directly involved in the discussions or the evaluation of the Business Purpose and who have a need to know such Confidential Information for the purpose of evaluating the Business Purpose and who have agreed to keep such Confidential Information confidential in accordance with the terms and provisions of this Agreement); (ii) not to use the Confidential Information for any purpose other than in connection with the Business Purpose including, but not limited to, reverse engineering, decompiling, disassembling, altering, duplicating, modifying or creating derivative works therefrom; and (iii) not to disclose to any person (other than such Representatives of the Receiving Party who are actively and directly involved in the discussions or evaluation of the Business Purpose and who have a need to know

May 1, 2023
Page 2

for the purpose of evaluating the Business Purpose and who are have agreed to maintain in
confidence the information disclosed hereunder in accordance with the terms and provisions of
this Agreement), the fact that discussions are taking place with respect to the Business Purpose
(including the status and terms of such discussions) or the fact that Confidential Information has
been or may be made available to the Receiving Party and/or its Representatives

The NDA provided that all Confidential Information taken would have to be returned or
destroyed upon 10 days written notice. SDI has already requested that Same Day return or
destroy the Confidential Information, but I am formally making that demand again pursuant to
the NDA that all Confidential Information be destroyed or returned by no later than May 11,
2023. A special drop box was created to include all the SDI confidential insurance contracts to
answer Same Day's questions about SDI Labs in-network insurance billing contracts upon the
request of Huettenbach. There is also a slew of Confidential Information requested through
emails and meetings.

| Folder Name | Item Name |
|---|---|
| **Marketing Bill of Materials** | Presentations , logos copy, design |
| | Data Sheets |
| **SDI Business Licenses** | Certificate of Accrediations |
| | CLIA licenses and SDI Mobile CLIA |
| | City of Stanton business licenses |
| **SDI Financial** | Tax Returns:2021,2020 |
| | SDI Bank Statements |
| | Sale Tax and Returns |
| | Payroll Register |
| | Closing statement |
| | P&L and Balance Sheets :Interim 2023, 2022,2021,2021 |
| **SDI Inventory List** | SDI Labs Equipment Asset and Inventory |
| **SDI Labs Customer List** | Facilities with Primary Contact Information |
| **SDI Labs HR** | SDI Hand book 2021 |
| | Individual employee Folders |
| **SDI Labs Contracts_ Notification proof to Insurance Payors** | Insurance Proof of Notifications Compiled, Insurance pYaor contracts |
| **SDI Labs Minority Status Certificate** | Certificate of Minority Group |
| **SDI Monthly Expense** | Monthly Expense Budget |
| | Liability Insurances |
| | Business Lease |
| **SDI Vendor List and Software Subscriptions** | SDI open system reagant vendors , consumbales, buffers IFU, Gate keeper software integration API documentation |
| **Training Plan for Lab Techs** | Manual Extraction Trainings |
| | Apricot Extraction Trainings |
| | Proper Pippette Tranings |
| | Gene Finder PCR Trainings |
| | Gene Finder Extraction Less Trainings |
| | Lumira PCR Trainings |
| **Validation Plan, Test Menu and Instrument Service Date** | SDI Labs Maintance Agreement for AU640, Access2 and Sysmex 1800 |
| | SDI CAP Summation Report 2022 |
| | PMA services for Access 2 |
| | Instrument Test Menu and validation work flow |
| | BioGX Syndromic Multiplexes- CE-IVD |
| | BioGX Syndromic quote for SDI UTI |
| | 2022-12-28 Instrument test menu and validation Plan Priotized V122722 |
| | Respiratory Pathogen Panel 2022.05.18 |
| | 2022 BioGX Sale Agreement |

We have reason to believe that SDI's Confidential Information has been used and is still
being used by Same Day and its affiliated companies which include QuickMeddx Diagnostics,

May 1, 2023
Page 3

Fundamentum Health, Inc. and Berry Dx. You will need to conduct a thorough investigation to ensure that all Confidential Information is recovered.

SDI is entitled to know if Same Day, its affiliated companies, partners, vendors, contractors, or customers have used and is still using any of SDI's Confidential Information. If that has occurred, we expect an honest response indicating specifically: (1) what Confidential Information was used; (2) the name and contact information of the persons and entities that used or still uses the Confidential Information; and, (3) the time period in which said Confidential Information was used.

We look forward to your full compliance with the NDA as well as a report addressing whether SDI's Confidential Information was used or is still being used. Once we have our Confidential Information returned, we will address your request for return of the escrow deposit.

Very truly yours

TIEDT & HURD

JOHN E. TIEDT

JET/jrh
cc:     Sarah Thomas – sarahthomas@sameday-testing.com
        SDI Labs, Inc. - ozman@sdilabsinc.com



**TIEDT & HURD**
Attorneys at Law

1250 Corona Pointe Court, Suite 402
Corona, CA 92879
Tel: (951) 549-9400 ♦ Fax: (951) 549-9800

May 2, 2023

**VIA REGULAR AND EMAIL**
Nioura F. Ghazni
Danielle Vrabie
Sheppard Mullin
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Email: nghazni@sheppardmullin.com; DVrabie@sheppardmullin.com

  Re: Addendum to May 1 letter

Gentlepersons:

  I want to ensure that you have the proper detail to find all of the Confidential information. For your convenience, I have listed Confidential Information that was requested through emails and meetings. Hopefully this list will further assist you in locating the Confidential Information.

- **SDI Labs Business and Marketing Bill of Materials**
  - SDI Labs corporate information
  - Sales trainings and process
  - Customer Value proposition Messaging and Presentations
  - Digital marketing assets: Copy, Logos, web design
  - Test Assay Product demos, videos, flyers and Data Sheets by customer type
    - Antigen- Nasal with RT-PCR- Instructions-11-12-20.pdf
    - Anterior Nasal Rapid Antigen Collection Instructions.pdf
    - Antigen and RT-PCR Supervised Self Collection Instructions-10-22-20_v1.pdf
    - Antigen and RT-PCR Supervised Self Collection Instructions-10-22-20_v1.pptx
    - Antigen datasheet 3.2.22.pdf
    - Antigen Datasheet 22 Sept - Oral+Nasal.pdf
    - Antigen updated.pdf
    - App Flow Document.docx
    - Back To School Data Sheet.pdf
    - RT-PCR Patient Test Result Sample copy
    - Candida Auris.pdf
    - Candida_auris_508.pdf
    - Corporate Services Fact Sheet x1.pdf
    - Corporate Services Fact Sheet-4-21-21_v3.pdf
    - Corporate Services Fact Sheet-4-21-21_v3.pptx
    - Data Sheet - Enterprise.pdf
    - data sheet SDI 2.jpg
    - Employee Testing.pdf
    - Enterprise dat.pdf

May 2, 2023
Page 2

- FINAL Anterior Nasal Self Collection Instructions-3-19-21_v4[38].pdf
- final Corporate Services Fact Sheet .pdf
- Flyer SDI 4 copy.jpg
- Flyer SDI 5.pdf
- IFU RTPCR.png
- IFU.pdf
- Lab Testing - All Services - 2-4-21_v1-Draft.pdf
- MicrosoftTeams-image (8).png
- Nasal Antigen Datasheet.pdf
- Nasal Antigen Data Sheet - General.pdf
- Nasal Antigen Data Sheet - Texas.pdf
- Oropharyngeal RT-PCR Collection Instructions-5-24-21.pdf
- Oropharyngeal RT-PCR Coll…structions-10-20-20_v1.pdf
- Respiratory Pathogen Panel-Design Doc.pdf
- RPP.pdf
- RT-PCR data sheet.pdf
- RTPCR data sheet.pdf
- RTPCR data sheet.pptx
- SDI Antigen Data Sheet.pdf
- SDI Antigen.pdf
- SDI Labs Services Brief - 2-9-21_v3.pdf
- SDI Labs_Oral Rapid Antigen Test_overview_June 2021.pdf
- SDI-ANbio-IFU Nasal Swab (1).pdf
- Throat Swab Specimen Collection Instructions 09.08.2020.pdf
- Travel Data Sheet.pdf
- variants.pdf
- variants.png
- WhatsApp Image 2022-09-01 at 1.11.48 AM.jpeg
- Quick Start Guide #34315965.0 - As Modified.pdf
- Antigen + RT-PCR flow Deck.pptx
- COVID-RSV-Flu.pdf
- Distributor Onboarding Deck.pptx
- DROID Mobile app Presentation.pptx
- Gatekeeper Overview.pptx
- GK Presentation.pptx
- Pharmacy FAQ.pdf
- SDI Deck.pptx
- SDI Labs Customer Value Prop_Oz_RA_AS.pptx
- SDI Onboarding Deck.Pptx
- SDI Operation_Logistics_CC.pptx
- Testing for Employer copy.pptx
- Testing for Schools .pptx
- UTI.pptx
- Demo Presentations

May 2, 2023
Page 3

- Videos Link.docx
    1. Screening Test v0.1.8.mp4
    2. Droid_v0.1.315.mp4
    3. Facility_add_v0.4.44.mp4
    4. Location_v0.4.45.mp4
    5. Patient_v0.4.44.mp4
    6. Test_Order_v0.4.44.mp4
- Droid Screen Recording.mp4
- Facility_add_v0.4.44.mp4
- Location_v0.4.45.mp4
- Patient_v0.4.44.mp4
- Screening Test v0.1.8.mp4
- Test_Order_v0.4.44.mp4
- DBS (Hormone Diagnosis) DROID Flow.mp4
- DBS.mp4
- Droid_combined_flow.mp4
- LAB SCIENCE.pptx
- SDI Operation_Logistics_CC.pptx
- DROID SDI Patent Document.pptx
- **SDI Labs Business & Healthcare compliance Licenses**
    a. Center for Medicaid and Medicare Services CLIA License
    b. CAP Certificate of Accreditation
    c. HIPPA Seal of Certification
    d. Patient Medical records
    e. City of Stanton business License
- **SDI Labs Corporate information**
    a. National Provider Information
    b. EIN and Tax information
    c. SDI Lab Minority status SPMC Certificate
    d. CMS Medicare assigned PTAN
    e. Business Liability insurance contracts
    f. Business property lease agreements
- **SDI Labs Financial documents**
    a. SDI lab Tax Returns
    b. SDI Labs Bank Statements
    c. Sales Tax and Returns
    d. Payroll Register
    e. SDI Labs Monthly operations Expense Budget
    f. Profit & Loss statements and Balance Sheet
    g. SDI Labs Lab service agreements (LSA)
    h. Medical Billing and patient claim information
    i. Insurance claim submission process
    j. Insurance payor payment data and pricing
    k. Balance sheets and income statements
    l. State and federal Income Tax filings
    m. Bank account statements

May 2, 2023
Page 4

      n.  HR, Payroll and accounting system login information
      o.  Customer Hubspot CRM system information
      p.  SDI Labs Human Resources employee data & Payroll information
      q.  Individual employee information files

- **SDI Mobile Lab (lab on wheels)**
  a. Mobile Lab Design and configuration Plan
  b. SDI Mobile Lab CLIA CDPH License
  c. SOP and instrument workflow data
  d. Mobile Lab Software design
- **SDI Labs Customer List and agreements**
  a. SDI Labs sales agreements with customers
  b. Customer on-boarding process
  c. Patient enrollment process
- **SDI Labs Health insurance Plan in-network Payor Contracts (46 health plans)**
  - Public & State Health plan Payors
  - Medi-Cal
  - Medicare
  - Tricare
  - United Military & Veterans
  - Tricare / ChampUs
  - Private Healthplan Payors
  - Aetna (National Advantage Plan)
  - Anthem Blue Cross Of California PPO, EPO, HMO, Senior PPO
  - Anthem Blue Cross Of California Medicare Advantage
  - Blue Shield Of California PPO
  - Blue Shield Of California Tricare
  - Care 1st health Plan
  - First Health
  - Humana
  - Multi Plan National Contract
  - United Healthcare
  - Healthnet of California
  - Oxford Health Plan (United)
  - Empire Health Plan (United)
  - Community Care Network
  - CIGNA
  - California Independent Physician Associations (IPAs)
  - Regal medical Group
  - Lakeside Community Health care
  - ADOC Medical Group
  - Bella Vista Medical Group
  - Apple Care Medical Group
  - Pacific Health IPA
  - Allied Physician of California
  - Accountable Healthcare

May 2, 2023
Page 5

- Angeles IPA
- Asian Community Medical Group
- California Pacific Physicians Medical Group
- CalOPTIMA Direct (Medi-Cal orange County
- Employee Health Systems (EHS)
- Family Choice Medical Group
- Healthy New Life
- Hunting Park mission medical group
- Karing Physicians
- Medical/ Ca department of public health
- Noble IPA
- Noble- mid orange IPA
- Prospect Medical Group and Subsidiaries
- United Care Medical Group

- **SDI Labs Vendor List and contact information**
   a. SDI Labs Vendor agreements and contractual pricing information
   b. Vendor Reagents Patient data sheet and Instructions For Use

- **SDI Labs Software Subscriptions and Integration services**
   a. Gatekeeper API Integration process.pdf
   b. Gatekeeper Software based customer on boarding process.mp4
   c. Gatekeeper Web app Patient intake process video.mp4
   d. Gatekeeper Insurance eligibility and verification billing process.mp4
   e. Hubspot CRM system information.pdf
   f. DROID Mobile patient testing application

- **SDI Labs Laboratory developed Test menu (FLU, A/B, RSV, COVID-19, UTI, GI, STI, Metabolic disorders, Lipids, Wellness, Hormones,)**
   a. SDI Labs, Test Menu on open system Instrument Services
   b. SDI Labs Quality Control Manual
   c. SDI lab automation workflow
   d. R&D Validation Plan and process by test
   e. Standard operating procedures (SOPs)
   f. Instructions for use (IFU)
   g. Patient proficiency Reagent validation
   h. FDA (EUA) data
   i. Extraction buffer formula
   j. Specimen collection VTM and kit validation data
   k. Instructions for Use
   l. Training Plan for Lab Technicians
      i. Manual Extraction Trainings
      ii. Apricot Extraction Trainings
      iii. Proper Pipette Training
      iv. Gene Finder PCR Trainings
      v. Gene Finder Extraction Less Trainings
      vi. Lumira PCR Trainings
   m. SDI Labs Maintenance PMA Agreement for AU640, Access2 and Sysmex 1800
   n. SDI CAP Summation Report 2022

May 2, 2023
Page 6

      o.  PMA services for Access 2
      p.  Instrument Test Menu and validation workflow
      q.  BioGX Syndromic Multiplexes- CE-IVD
      r.  BioGX Syndromic quote for SDI UTI
      s.  2022-12-28 Instrument test menu and validation Plan Prioritized V122722
      t.  Respiratory Pathogen Panel 2022.05.18
      u.  2022 BioGX Sale Agreement

As I stated in my letter we sent today, we have reason to believe that SDI's Confidential Information has been used and is still being used by Same Day and its affiliated companies which include QuickMed Diagnostics/QuickMeddx, Fundamentum Health, Inc. and Berry Health Solutions/BerryDx.  Your clients are aware of where the Confidential Information was sent and who used it.

Again, SDI is entitled to know if Same Day, its affiliated companies, partners, vendors, contractors, or customers have used and is still using any of SDI's Confidential Information. If that has occurred, we expect an honest response indicating specifically: (1) what Confidential Information was used; (2) the name and contact information of the persons and entities that used or still uses the Confidential Information; and (3) the time period in which said Confidential Information was used.

We look forward to your full compliance with the NDA and a report addressing whether SDI's Confidential Information was or is still being used. Once we have our Confidential Information returned, we will address your request for the return of the escrow deposit.

Very truly yours,

**TIEDT & HURD**

JOHN E. TIEDT

JET/jrh
cc:    Sarah Thomas – sarahthomas@sameday-testing.com
       SDI Labs, Inc. - ozman@sdilabsinc.com

# PROOF OF SERVICE

## SDI LABS, Inc.  v.  SAMEDAY TECHNOLOGIES, INC
### U.S. District Court Case No.2:23−cv−05619−MWF(MRWx)

**STATE OF CALIFORNIA**          **)**

**                                 )  ss.**

**COUNTY OF RIVERSIDE**          **)**

I am employed in the County of Riverside, State of California.  I am over the age of 18 years and am not a party to the within action; my business address is 1250 Corona Pointe Court, Suite 407, Corona, California 92879. On October 2, 2023, I served the following documents described as:  **FIRST AMENDED COMPLAINT** on the interested parties in this action by electronic service, via e-mail from Outlook 365, to e-mail addresses that I know to be associated with each counsel after having received communications from them at said addresses:

**SHEPPARD MULLIN, RICHTER & HAMPTON, LLP**
Juthamas J. Suwatanapongched, Esq.
Taryn Q. McPherson, Esq.
333 South Hope Street, 43rd Floor
Los Angeles, CA  90071-1422
jsuwatanapongched@sheppardmullin.com
tmcpherson@sheppardmullin.com

Danielle Vrabie, Esq.*(Pro hac vice)*
30 Rockefeller Plaza
New York, New York 10112-0015
dvrabie@shepaprmullin.com

**TIEDT & HURD**

John E. Tiedt, Esq.
Marc S. Hurd, Esq.
1250 Corona Pointe Court, Suite 402
Corona, CA 92879
jtiedt@tiedtlaw.com
mhurd@tiedtlaw.com
jhusk@tiedtlaw.com

I declare that I am a member of the Bar of this Court. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on October 2, 2023, Corona, California.

_____
Robert J. Lynch